407 So.2d 666 (1981)
STATE of Louisiana
v.
Richard DAVIS, a/k/a Richard Candy.
No. 81-KA-0593.
Supreme Court of Louisiana.
December 14, 1981.
*667 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Lowen B. Loftin, Dist. Atty., E. Rudolph McIntyre, Jr., Asst. Dist. Atty., for plaintiff-appellee.
Donnie L. Ellerman, Johnny R. Boothe, Winnsboro, for defendant-appellant.
GARRISON, Justice Ad Hoc.[*]

I
The defendant, Richard Davis, was charged in two separate grand jury indictments with committing the second degree murder of Lela Mae Scott and Sir Walter Scott, husband and wife, in violation of R.S. 14:30.1. The victims were the step-grandmother and the grandfather, respectively, of the defendant.
On November 3, 1980, the defendant pleaded guilty to both charges of second degree murder and was sentenced to life imprisonment at hard labor with the Louisiana Department of Corrections. The basic facts of the case are as follows: On November 9, 1979, the two victims were found lying in a pool of blood on the floor of their home located near Wisner, Franklin Parish, Louisiana. The victims had been killed by gunshot wounds and it was apparent that they had been dead for several days. The investigation at the scene of the crime revealed that a number of items was missing from the residence of the victims, among which were a color television set, a shotgun, and a green 1977 Dodge automobile bearing Louisiana license number 178F282, registered in the name of Lela Mae Scott.
It was learned that the defendant had been residing with the murder victims for about three months. He had been observed in the Wisner area on Thursday night, December 6, 1979, driving the missing Scott automobile and subsequently was seen leaving the Wisner area on Friday morning, December 7, driving the same car.
Neither Sir Walter Scott nor his wife had been seen nor heard from since Thursday afternoon, December 6. Relatives and friends of the victims informed Sheriff Eugene Parker and other officers at the scene of the crime that they had never seen Richard Davis driving the missing vehicle and that the murder victims never allowed anyone to drive the missing car, including the defendant. As a matter of fact, it was learned that Mr. Scott even refused to let Davis drive the car to work and that he drove the defendant to work every day.
Based on the information then available, the Franklin Parish Sheriff's Office made an NCIC entry on Sunday, December 9, 1979, for Richard Davis, including his description, concerning the theft of the missing Scott automobile. Sheriff Parker informed his deputies to be on the lookout for a young black male, named Richard Davis, also known as Richard Candy, in reference to the theft of the missing automobile, shotgun and color television set. A description of the defendant and the missing items also was given to the deputies at the time. Davis also was indicated as wanted for questioning *668 regarding the murder of his grandfather and stepgrandmother. The following day, Deputy Joe Powell and Deputy Amos Virgil were gassing their police car at a service station near the sheriff's office in Winnsboro. While the deputies were standing at the service station, the missing green 1977 Dodge automobile, bearing the license number which had been given out, pulled into the gas station. The car was being driven by a young black male fitting the description of the defendant.
After confirming the appearance of the vehicle and the appearance of the driver with the information which had been provided by the Franklin Parish Sheriff's Office, Deputy Joe Powell approached the Dodge automobile. It is to be noted that Powell was wearing his official Sheriff's Department uniform with his gun in a holster at his waist. He stood next to the open window on the driver's side and announced to the defendant, who was at the wheel, that he was a police officer and that the defendant was under arrest. Nevertheless, as Deputy Powell was attempting to open the driver's door to remove the suspect from the vehicle, the defendant started the car and sped out of the service station onto the highway. Deputy Powell's arm was caught in the driver's door window and as the car moved forward, he was dragged along the side of the vehicle. Somehow Deputy Powell was able to fire his pistol inside and he succeeded in freeing his hand, which caused him to fall to the pavement behind the speeding car.
Several hundred feet down the road from the gas station the defendant stopped the automobile, jumped out of it and ran off the highway into the woods. Following a search of the neighboring area, he was located underneath a house in Winnsboro, where he was arrested for the theft of the automobile, attempted aggravated battery and resisting arrest. In this connection, it is to be noted that the defendant had been shot in the stomach, presumably by the gun fired by Deputy Powell. Because he required immediate medical attention, the defendant was rushed to the Franklin Parish Hospital.
It was subsequently confirmed that the Dodge automobile the defendant had been driving was indeed the car which had belonged to Sir Walter Scott and his wife. Additional investigation of the case in Vicksburg, Mississippi, revealed that the defendant had sold the shotgun and color television missing from the Scott residence to one Larry Freeman of Vicksburg, Mississippi.
On December 14, 1979, as the result of the evidence collected as of that date, the defendant was arrested with a written warrant of arrest charging him with the second degree murder of Sir Walter Scott and Lela Mae Scott. As indicated above, he subsequently pleaded guilty to both charges.

II
Although the defendant pleaded guilty as indicated, two Assignments of Error are before the court on this case. The first contends that the arrest of the defendant for auto theft was made without probable cause and that consequently the evidence flowing therefrom should have been suppressed.
A probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. State v. Collins, 378 So.2d 928 (La., 1979); State v. Wilkens, 364 So.2d 934 (La., 1978); State v. Johnson, 363 So.2d 684 (La., 1978); State v. Marks, 337 So.2d 1177 (La., 1976). Although mere suspicion cannot justify an arrest, the officer does not need sufficient proof to convict. State v. Thomas, 349 So.2d 270 (La., 1977); State v. Randolph, 337 So.2d 498 (La., 1976).
One of the most important elements in determining whether possible cause exists is satisfied when the police know a crime actually has been committed. When a crime has been committed and the police know it, they only have to determine whether there *669 is reasonably trustworthy information to justify a man of ordinary caution in believing the person about to be arrested has committed the crime. Collins, supra at 930.
These standards certainly seem to have warranted probable cause for arrest for theft of the automobile. In point of fact, they probably also have warranted an officer's determination of probable cause to arrest for the murders.
Even assuming, for the sake of argument, that probable cause, as such, did not exist, there were certain facts which clearly warranted the stopping of the green Dodge automobile. A serious crime had occurred when two people were murdered. The defendant had resided with the victims and was last seen driving their car, the green Dodge. C.Cr.P. art. 215.1 permits an officer to temporarily detain a person whom he reasonably suspects has committed an offense. Only reasonable suspicion is required to temporarily detain a suspect for questioning. State v. Kenner, 384 So.2d 413 (La., 1980).
The facts in the present case, which were known to Deputies Virgil and Powell, were clearly sufficient to justify a stop of the vehicle which matched the teletyped description and license number of the car belonging to the murder victims. Furthermore, the driver of the car matched the description of the victims' grandson. Before any detention could be effected, the defendant sped away from the officers. Furtive actions and flight at the approach of law officers may be proper factors in the decision to make an arrest if coupled with specific knowledge on the part of the officers relating the suspect to the evidence of crime. Sibron v. New York, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); State v. Herbert, 351 So.2d 434 (La., 1977). The defendant's sudden flight from the officers may well have given them probable cause to arrest him when considered with all of the other facts which they had to know.
This assignment of error is without merit.

III
The defendant contends that his confession, given to the authorities on December 17, 1979, was taken in violation of his right to counsel.
The sheriff testified that he spoke with the defendant on two different occasions on December 17, 1979. That morning between 9:30 and 10:00 a.m. the defendant sent word to the sheriff that he would like to make a statement in reference to the death of his grandparents. As the defendant was being taken downstairs, the sheriff called Mr. Ellerman, the defense counsel. Ellerman promptly arrived at the sheriff's office and, after speaking privately with the defendant, advised the sheriff that Davis did not wish to make a statement at that time. The defendant was then taken back upstairs.
Later that day, however, shortly after 1:30 p.m., Deputy George Washington advised the sheriff that Davis wanted to make a statement. The defendant was again brought downstairs to the sheriff's office. At this time the sheriff tried to locate the defense counsel at his office but was told that he was out of town and would not be back that afternoon. The defendant was present during this call and was told the information but replied, "Well, I was just gonna let him know that I'm fixing to give an interview but he's not accounted for, so it's all right with me." Shortly afterwards the defendant repeated, with regard to his defense counsel, "Well, since he can't be contacted, I'm still going to make a statement."
The only reasonable interpretation of the defendant's resulting statement leaves no doubt that the utmost care was taken by Sheriff Parker and Trooper French in explaining to the defendant his rights and telling him that he did not have to make a statement without his attorney. In point of fact, Sheriff Parker specifically reminded Davis that his attorney had advised him not to make a statement. Nevertheless, the defendant chose to continue with the interview.
*670 Whenever a statement is taken without the presence of an attorney, a heavy burden rests upon the State to demonstrate that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to have counsel present. State v. Vernon, 385 So.2d 200 (La., 1980). Moreover, before a confession or inculpatory statement may be introduced into evidence, the State must prove affirmatively and beyond a reasonable doubt that the statement was free and voluntary and not made under the influence of fear, duress, menaces, threats, inducements or promises. La.Const. 1974, Art. 1, § 13; La.R.S. 15:451; La.C.Cr.P. art. 703(C); State v. Vernon, supra at 204; State v. LeJeune, 352 So.2d 619 (La.,1977); State v. McGraw, 366 So.2d 1278 (La., 1979).
These standards appear to have been more adequately met by the recorded confession of the defendant. He was told repeatedly that he did not have to speak without his attorney present. Furthermore, he was reminded that his attorney did not want him to make a statement. He was also informed on several occasions that he had the right to remain silent. The defendant advised Trooper French that he had completed the twelfth grade and that he completely understood that he was waiving his rights in giving the statement.
On several occasions the defendant was asked whether he was making the statement of his own free will with no pressure, promises or threats from anyone. He replied that the statement was of his own free will without pressure and with no promises nor threats made to him. In State v. Vernon, supra at 204, this court held that the State had met its burden when it proved that the defendant was adequately advised of his rights and consented to questioning, and when it proved that defendant acknowledged that he had not been promised anything in return for a statement.
At the hearing on the motion to suppress, the defendant testified that when he was taken back to his cell on December 17, 1979, after he had refused to make a statement, Deputy George Washington and another man came into the cell with him. Although the defendant did not know the other man's name he stated that the man told him that he owned a service station in Wisner and that he knew the defendant. The defendant's testimony at this time was to the effect that the other two were telling him how easy it would be if he would just help them with regard to his making a confession. According to the defendant he listened for a while and then agreed to make such a confession andaccording to the defendant it was at that time that Deputy Washington went downstairs to inform the sheriff of the defendant's decision. The defendant's testimony added, further, that it was at that point that the other man informed him that he was doing the right thing and that now he could get psychiatric help because the sheriff could "pull the strings."
Naturally, such testimony as the defendant's would raise the most serious questions about the integrity of any confession. However, following the testimony of the defendant, Deputy Washington took the stand and denied all of the defendant's allegations. He stated that he did not promise the defendant anything in order to get him to make a statement nor did he take anyone to the defendant's jail cell to talk to the defendant. The defendant never produced the other man allegedly involved, but defense counsel mentioned the name Pete Douglas to Deputy Washington. However, no facts were ever introduced that Pete Douglas had actually been the other man.
Although it has been recognized that an accused may later change his mind and waive the same rights which he earlier asserted [State v. Manning, 380 So.2d 46 (La., 1980), and State v. Dominick, 354 So.2d 1316 (La., 1978)], once a defendant has invoked his constitutional right to remain silent or his right to counsel, the validity of any subsequent waiver depends upon the "scrupulous honoring" of that right by the police. Michigan v. Mosely, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); State v. Thucos, 390 So.2d 1281 (La., 1980); State v. Manning, supra. The State's burden here is a *671 heavy one. State v. Mouton, 366 So.2d 1336 (La., 1978); State v. Peevy, 321 So.2d 324 (La., 1975).
It is true that there are some minor inconsistencies, with regard to the testimony of Sheriff Parker and Deputy Washington, as to precise time factors relating to the defendant's volunteering to make the confession. However, it is apparent that the trial judge who denied the motion believed the testimony of the officers regarding the free and voluntary nature of the confession. Admissibility of a confession is, in the first instance, a question for the trial judge. His conclusions on credibility and weight of testimony relating to voluntariness will not be overturned unless they are not supported by evidence. State v. Lewis, 353 So.2d 703 (La., 1977).
In this case, it is apparent that the weight of the evidence leaves no doubt that the conduct of the authorities, relative to the obtaining of the confession, was entirely proper, that there was no form of pressure, promises, threats nor "seduction" used against the defendant to obtain the statement and that the resultant confession was entirely free and voluntary in accordance with constitutional requirements.
Accordingly, this assignment of error with regard to the confession also appears to be without merit.
For the reasons assigned, the defendant's guilty pleas, and the resultant sentence, are affirmed.
AFFIRMED.
DIXON, C. J., and CALOGERO, J., concur.
NOTES
[*] Judges James C. Gulotta and Jim Garrison of the Court of Appeal, Fourth Circuit, and Bernard J. Bagert of the Criminal District Court, Parish of Orleans, participated in this decision as Associate Justices ad hoc, joined by Chief Justice John A. Dixon, Jr. and Associate Justices Pascal F. Calogero, Jr., Walter F. Marcus, Jr. and Fred A. Blanche, Jr.