682 So.2d 713 (1996)
STATE of Louisiana
v.
Willard ALLEN.
No. 95-KA-1754.
Supreme Court of Louisiana.
September 5, 1996.
Rehearing Denied October 4, 1996.
*716 James Earl Calhoun, Natchitoches, for Applicant.
Richard P. Ieyoub, Attorney General, Stephen M. Henry, District Attorney, Van Hardin Kyzar, Billy Joseph Harrington, Natchitoches, for Respondent.
KIMBALL, Justice[*]
A Natchitoches Parish grand jury indicted Willard Allen for the first degree murder of Herman Ferguson, in violation of LSA-R.S. 14:30. After a trial by jury, the defendant was found guilty as charged and unanimously sentenced to death based upon the jury's findings of two aggravating circumstances. The trial judge sentenced the defendant to death in accordance with the recommendation of the jury. This is the direct appeal of his conviction and sentence.
On appeal, Allen relies on twelve assignments of error. We find no merit in any of the assignments and affirm both the conviction and sentence.

FACTS
The following facts were adduced in the guilt phase of the defendant's trial. On September 7, 1993, police responded to a call at the Cherokee Club (Club) in Campti, Louisiana. Upon arrival at the club, police discovered the body of Herman Ferguson, who had been shot six times with a .380 caliber weapon. His body was discovered by Kathy Jacobffy (club bartender) and Mary Messick (club co-owner). There was also evidence that indicated money had been stolen from the club's safe.
The investigating officer, Deputy Wade Ebert, learned the defendant, a frequent patron and former part-time employee of the club was at the club with the victim when it closed in the early morning hours of September 7. It was also learned during this initial investigation at the scene that the defendant was known to own a .380 caliber weapon, the same type of weapon used in the murder. Based upon this information, Deputy Ebert requested the defendant be located for questioning.
Around 10 p.m. on September 7, Deputy Patrick Custis spotted defendant's white car and stopped him in a parking lot located next door to the Natchitoches Parish Sheriff's Sub-Station in Campti. Deputy Custis radioed Deputy Ebert who drove over from Natchitoches to question the defendant. Upon arriving at the scene, Deputy Ebert asked the defendant if he owned a .380 caliber weapon. The defendant responded that he did, stating that the weapon was in the trunk of his car. The defendant was advised of his Miranda rights and consented to the search of his vehicle by signing a consent form. The search yielded a .380 caliber semi-automatic handgun, some spent .380 caliber shells, live .380 cartridges, $625.00 in cash and a metal money box commonly used for carrying quarters. These items were seized and the defendant accompanied the *717 officers next door to the substation for further questioning. The defendant told the officers he had loaned the .380 caliber handgun to Gabriel Clark on September 6. The defendant was then released.
On September 8, Deputy Ebert spoke with Gabriel Clark about the .380 caliber handgun and Clark denied borrowing the gun from the defendant. Deputies then picked up the defendant and brought him to the Natchitoches Sheriff's station for further questioning. At the station, defendant was advised of his rights and signed a waiver of Miranda rights form. The defendant then confessed to the robbery and murder and was arrested.
The defendant's confession, in its entirety, was admitted at trial. According to his confession, the defendant and Gabriel Clark had discussed robbing the Cherokee Club for about two weeks prior to the actual robbery and murder. The defendant stated that on Monday, September 6, 1993, he and Clark decided it was a good night to rob the club. Around 11 p.m. that evening, the defendant went to the club as it was closing and only Sandra Hicks (a waitress) and the victim were there. The defendant left and again discussed robbing the club with Clark. According to the defendant's confession, he and Clark drove out to the club in the defendant's car. Clark dropped the defendant off a short distance from the club and waited for him at a nearby gas station. The defendant then went to the victim's trailer, which was located next door to the club, and told the victim his car had quit. The victim gave the keys to his truck to the defendant and defendant drove the victim's truck to the gas station where Clark was waiting. The defendant left his car at the gas station and used the victim's truck to drive Clark to his (Clark's) mother's house. According to the defendant, he and Clark were going to meet back at the club to rob it. However, Clark denied any direct involvement in the robbery and murder and was not present at the club when the victim was murdered.[1]
The defendant then returned to the victim's trailer. Upon arriving at the trailer, defendant told the victim that defendant's car was fixed and that he needed a ride to pick up his car. The victim gave defendant a ride to the place defendant claimed his car was located. After the victim and defendant were unable to locate defendant's car, they returned to the victim's trailer. Once they were back at the trailer, the defendant told the victim he needed the combination to the club's safe. The victim inquired as to what was going on and the defendant pulled a gun on him. The victim then gave the defendant the combination; however, the defendant could not remember it. It was decided that the victim would open the safe himself. The defendant and the victim then walked next door to the club. According to the defendant, the victim opened the safe and then attacked the defendant. The defendant claims the gun discharged while he was trying to fend off the victim's attack. After the gun discharged, defendant removed the money from the safe and fled the club.
James Calhoun was appointed by the trial court as lead counsel for the defendant. On September 29, 1993, a grand jury indicted Willard Allen for first degree murder. Allen was arraigned on October 15, 1993, at which time he entered a not guilty plea. Several pre-trial motions were filed, including a Motion to Suppress and a Motion for Funds for a psychiatrist and private investigator. The Motion to Suppress was denied but the Motions for funds for a psychiatrist and private investigator were granted. After several continuances the case went to trial on October 11, 1994.
At trial, the coroner testified the victim had been shot six times. The first bullet, which inflicted the fatal wound, went through the chest from front to back. Defendant was also shot several times in the abdominal area, in the arm and in the back of the head.
The jury found the defendant guilty of first degree murder and determined he should be sentenced to death based upon the presence of two aggravating circumstances: (1) the perpetrator was engaged in the commission of an armed robbery (La.C.Cr.P. art. *718 905.4(A)(1)); and (2) the offense was committed in an especially heinous, atrocious, or cruel manner (La.C.Cr.P. art. 905.4(A)(7)). The prosecutor made no opening statement in the penalty phase of the trial; however, he did introduce by reference all of the trial testimony and did offer into evidence a photograph of the victim with his daughter.
The defendant was formerly sentenced to death by lethal injection on October 17, 1994. After sentencing, the defendant filed a motion for a new trial based upon evidence that the trial judge violated the rule of sequestration by making improper contact with the members of the jury. On October 26,1994, a hearing was held on this matter and the defendant's motion was denied. On October 28, 1994, the trial court resentenced defendant to death by lethal injection. This direct appeal followed.

PRETRIAL ISSUES

Assignment of Error No. 1
The defendant contends the trial judge erred in failing to suppress his confession and all physical evidence obtained as the result of the search and seizure of the defendant and his car.[2] According to defendant, the initial "traffic stop" by Deputy Custis was an illegal arrest. Thus, defendant argues his consent to search his car was tainted by that illegal arrest. Defendant also maintains that his confession was a direct fruit of the illegal arrest ("traffic stop") and therefore was also tainted.
La.C.Cr.P. art. 215.1 allows a law enforcement officer to stop a person in a public place whom he reasonably suspects has committed an offense and demand his name, address, and an explanation of his actions. This article is in accordance with the United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The validity of an investigatory stop depends on whether the officer has adequate articulable knowledge of particular facts, sufficient to warrant infringement upon the individual's constitutional right to be left alone. State v. Neyrey, 383 So.2d 1222, 1223-24 (La.1979). In determining if this adequate articulable knowledge exists, courts must consider the totality of the circumstances and whether the detaining officers have a particularized and objective basis for suspecting that the individual has engaged in criminal activity. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
The facts of this case clearly show there was reasonable suspicion to make the initial investigatory stop of the defendant in the parking lot located next to the Campti Sheriff's Substation. A murder had occurred in the area and the police had information linking the defendant to the crime. The defendant was the last person seen with the victim and was known to own the same type of gun used in the murder. In a similar murder case, State v. Davis, 407 So.2d 666, 669 (La.1981), this court noted there was reasonable suspicion to stop the defendant because he resided with the victims and was last seen driving their car.[3] The United States Supreme Court in Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) held that even an anonymous telephone tip corroborated by independent police work was enough to provide reasonable suspicion to make an investigatory stop of the defendant.
Defendant's argument that this initial investigatory stop was an arrest requiring the presence of probable cause to arrest the defendant is without merit. La.C.Cr.P. art. *719 201 defines arrest as "the taking of one person into custody by another ... [by] actual restraint of the person." In distinguishing between an investigatory stop and an arrest, courts have considered numerous factors. In Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the United States Supreme Court found a stop for questioning was indistinguishable from a traditional arrest because the suspect was not questioned briefly where he was but transported to the police station, was never informed he was free to go and, in fact, would have been restrained had he tried to leave. The United States Supreme Court in Michigan v. Chesternut, 486 U.S. 567, 574, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)) stated that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case." The Mendenhall Court also stated that in determining whether a person has been seized under the Fourth Amendment, one must determine whether a reasonable person would have believed he was free to leave. Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877. This court has considered this issue and determined that "it is the circumstances indicating intent to effect an extended restraint on the liberty of the accused, rather than the precise timing of an officer's statements: `You are under arrest,' that are determinative of when an arrest is actually made." State v. Giovanni, 375 So.2d 1360, 1363 (La.1979) (quoting State v. Sherer, 354 So.2d 1038, 1042 (La.1978)); see also, State v. Davis, 558 So.2d 1379, 1382 (La.App.1990); State v. Simms, 571 So.2d 145, 148 (La.1990). In both Giovanni and Simms, this court found an arrest based on the fact that the defendant was not free to leave.
The circumstances of this case show that the defendant was not under arrest as there was no restraint on his liberty and he was free to leave at anytime. Deputy Custis used no weapon or physical force to restrain the defendant. Both Deputy Custis and Deputy Ebert told defendant they only wanted to ask him questions and the defendant complied without objection. At no time was the defendant subjected to a search for weapons or placed in a police car or handcuffed. Moreover, the initial questioning and the search of the car took place in the parking lot where defendant was stopped by Deputy Custis. There is no indication that the officers intended to do anything other than briefly question the defendant. Most importantly, there is no evidence suggesting that the defendant was not free to leave at anytime. Therefore, no arrest of the defendant ever occurred at this initial stop.
Additionally, defendant claims that the consent given to search the vehicle was tainted by the "illegal arrest." However, as discussed above, the defendant was not subjected to an arrest but rather an investigatory stop. Deputy Ebert asked defendant if he owned a gun and defendant replied that it was in the trunk. At this point, Deputy Ebert asked the defendant if he could search the vehicle and the defendant orally consented. Moments later, the defendant signed a consent to search form. The record reflects the defendant freely and voluntarily consented to the search of his car. There is no evidence either deputy coerced or forced the defendant to consent to the search. Therefore, the motion to suppress the evidence obtained as a result of the car search was properly denied by the trial court.
The defendant also argues an illegal arrest occurred when he accompanied the deputies next door to the substation for additional questioning. The defendant maintains he was taken from the Campti Sheriff's Substation to the Natchitoches Parish Sheriff's station by a law enforcement officer in a patrol car. While the record is not entirely clear on whether or not this occurred, Deputy Custis' testimony supports defendant's claim. According to the testimony of Deputy Ebert, the defendant had been verbally informed of his Miranda rights in the parking lot and signed a written certification acknowledging his Miranda rights at the substation. At this point, Deputy Ebert further questioned the defendant and defendant stated he had loaned his gun to Gabriel Clark on *720 the night Herman Ferguson was murdered. According to the testimony of Deputy Ebert, defendant was then released. There is no indication from Deputy Ebert's testimony that the defendant was ever transported from Campti to Natchitoches. However, Deputy Custis' testimony indicates defendant was transported to Natchitoches in a patrol car. Assuming, arguendo, defendant was in fact transported to Natchitoches, no illegal arrest occurred as there is no evidence defendant was forced to accompany the officers or that he was not free to leave.
In California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the defendant voluntarily agreed to accompany police to the station. Miranda rights were not given to the defendant and he agreed to talk about his involvement in a murder. The defendant was then told he was free to go. Five days later he was arrested, given a Miranda rights warning and confessed to the murder. While the Court primarily focused on whether a Miranda warning should have been given at the first interview, it also discussed what constitutes a formal arrest.[4] The Court held there was no formal arrest of the defendant based on the totality of circumstances. The fact the defendant was questioned in the station house does not mean there was a formal arrest. Instead, for a formal arrest to have occurred, there must have been a restraint on the defendant's freedom of movement.
In this case, the defendant voluntarily accompanied the deputies to the substation. Assuming the defendant was transported by a patrol car to the Natchitoches Sheriff's Station, there is no indication that the defendant was forced to go to Natchitoches. There is also no evidence suggesting the defendant was not free to terminate the interview at anytime and leave. Therefore, there was no restraint on defendant's freedom. Consequently, there is no merit to defendant's arguments that the search of the car[5] or the confession which was obtained a day after the initial questioning was tainted by an illegal arrest.

Assignment of Error No. 2
Defendant contends he was denied effective assistance of counsel when the trial court appointed an unlicensed private investigator, Charles Phythian, as the defendant's private investigator. La. R.S. 37:3520 makes it unlawful for any person to provide private investigator services without possessing a valid license. The record reflects that Phythian was not a licensed investigator and that he was inexperienced in the field of private investigation.[6] A review of the record also shows that Phythian did a poor job of investigating as he did not take any written statements from witnesses and refused to turn over a written report to the defense until he was paid. It is unclear from the record whether the defense had a choice of private investigators or was forced to accept Phythian.[7]
Part of the State's obligation in providing effective assistance of counsel to an indigent defendant is to furnish defense counsel with all of the "basic tools of an adequate defense" at no cost to the indigent defendant. Britt v. North Carolina, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). This court stated in State v. Madison, 345 So.2d 485, 490 (La.1977) that "[t]he right to a private investigator may in many cases be an adjunct to the right to counsel: furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense." This court also stated in Madison that "when an indigent defendant shows that his attorney is unable to obtain existing evidence crucial to *721 the defense, the means to obtain it should be provided for him...." Id. at 490. The burden is on the defendant to prove he is unable to obtain existing evidence crucial to his defense. State v. Monroe, 397 So.2d 1258 (La. 1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983).
The defendant did not meet his burden of showing that a private investigator was crucial to his defense. Defendant's Motion for Funds For Investigative Services simply requested funds and did not list nor did defense counsel argue any reasons why the services of a private investigator were crucial to the defense. In sum, the trial judge appointed an investigator to insure defense counsel possessed all the basic tools of an adequate defense without requiring any showing the services of a private investigator were crucial to the preparation of the defense. The defendant confessed to the murder, a co-defendant implicated the defendant, the murder weapon and other vital pieces of evidence were found in defendant's possession, and all of the witnesses were identified and easily accessible by defense counsel. Defense counsel failed to show the possibility of locating a vital piece of evidence or a witness that would be crucial to the preparation of defendant's case.
There was also no need to appoint an investigator to obtain mitigating evidence in favor of the defendant for the penalty phase. Defense counsel knew the names and addresses of all of the defendant's family and others who might be able to provide mitigating evidence. Dr. Paul Ware was also appointed by the court to conduct a psychological evaluation of the defendant in an effort to assist the defendant in obtaining mitigating evidence. As there was no need to appoint an investigator to assist the defense in preparation for the guilt or penalty phase, the fact the investigator was unlicensed or performed poorly is irrelevant. This assignment of error therefore lacks merit.

Assignment of Error No. 3
The defendant contends the trial judge erred by allowing the state discovery of internal defense statements made between defendant's private investigator, Charles Phythian and the defendant's attorney. The defendant also maintains the trial court erred by allowing the state discovery of statements made by prospective witnesses to defendant's private investigator.
On August 24, 1994, the trial court conducted a hearing in the presence of the defense counsel and the prosecutor to determine the propriety of a bill submitted by the defendant's private investigator, Charles Phythian. At this hearing, the court inquired into Phythian's background and into the basis for the bill submitted by Phythian. During the hearing, Phythian testified very generally as to the work he had performed on the case and did not specifically state the names of any potential witnesses whose identity was not already known by both sides.
Defense counsel failed to request an ex parte hearing and did not object to the open hearing. Therefore, any objection to this hearing was waived. This court held in State v. Taylor, 93-2201 (La. 2/28/96), 669 So.2d 364 that errors not contemporaneously objected to during the guilt phase of a capital trial were not reviewable on appeal. Moreover, even assuming that counsel's performance fell below an objective standard of reasonableness by failing to request an ex parte hearing, it did not prejudice the defendant as the testimony did not shed any light on the defendant's theory of the case. Therefore, this assignment of error lacks merit.

VOIR DIRE ISSUES

Assignment of Error No. 4
Defendant contends the trial court erred in denying his request for individual voir dire. Additionally, defendant contends the trial court committed reversible error by failing to insure the entire voir dire proceeding was properly transcribed.
The defendant claims he requested individual voir dire because several newspaper articles had been circulated within the community about the case. These articles referred to the defendant's confession and other details of the crime.
*722 The trial court has discretion over the manner in which veniremen are called and the scope of voir dire examination. State v. Copeland, 530 So.2d 526, 535 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). This court has held that the trial court does not err in refusing requests for individual voir dire without a showing of special circumstances. State v. Comeaux, 514 So.2d 84, 88 (La.1987). A capital case does not necessarily provide a special circumstance. Copeland, 530 So.2d at 535; Comeaux, 514 So.2d at 88; State v. Wingo, 457 So.2d 1159, 1165 (La.1984), cert. denied., 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). The defendant is required to show there is a significant possibility that group voir dire will expose potential jurors to prejudicial material. State v. David, 425 So.2d 1241, 1247 (La.1983), cert denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986).
The defendant was not prejudiced by the trial court's refusal to order individual voir dire, nor did defendant show any special circumstances warranting individual voir dire. While some of the potential jurors stated they had seen articles about the crime, none of them stated any specific details concerning the crime or the defendant, nor did any of them firmly state an opinion based on the articles. Therefore, this assignment is without merit as the trial judge did not abuse his discretion in denying the defendant's request for individual voir dire.
The defendant also maintains he was denied his right to judicial review based upon an incomplete record of the voir dire proceeding. During voir dire, the attorney's arguments concerning some of their peremptory challenges were not transcribed but noted as "bench conferences" in the record. However, the defendant fails to show he suffered any prejudice. Challenges for cause and the attorney's arguments concerning them were clearly transcribed in the record. Furthermore, the minutes clearly reflect which jurors were excused by peremptory challenges and whether the defense or prosecution exercised a peremptory challenge.
This court has held "[a] slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause ..." a reversal of a defendant's conviction. State v. Ford, 338 So.2d 107, 110 (La.1976). Thus, this assignment of error is without merit.

Assignment of Error No. 5
The defendant also maintains the trial court erred in requiring both defense counsel and the prosecutor to exercise their cause challenges to potential jurors at their respective counsel tables within the hearing of the veniremen. It is well-settled that the trial judge has wide discretion in controlling the conduct and scope of the trial and jury voir dire. State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). According to the record, there was only one instance where defense counsel was forced to make a cause challenge from his counsel table. The challenge was: "I think that a challenge for cause would be in order having formed an opinion based upon articles in the newspaper." This statement would not have prejudiced the other veniremen. Therefore, this assignment is without merit.

Assignment of Error No. 6
The defendant also contends the trial judge erred in denying his challenges for cause of three prospective jurors, Linda (Judy) Dixon, Clifton Smith and Cheryl E. Thornhill.
La. Const. art. I, § 17 guarantees "[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." La.C.Cr.P. art. 799 provides the defendant in a death penalty case with twelve peremptory challenges. Therefore, when a defendant uses all of his peremptory challenges, a trial judge's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683, 686; State v. Maxie, 93-2158 (La. 4/10/95), 653 So.2d 526, 534; State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1280. A defendant *723 must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. La.C.Cr.P. art. 800.
Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. Cross, 93-1189 at 1192, 658 So.2d at 686. Thus, "[t]o prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show (1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges." Id. The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will only be reversed when review of the entire voir dire shows the trial judge abused his discretion. Robertson, 92-2660 at 2663, 630 So.2d at 1281. The defendant in this case exhausted all his peremptory challenges. Therefore, the issue is whether the trial judge abused his discretion in denying defendant's cause challenges.
La.C.Cr.P. art. 797 provides in pertinent part that the defendant may challenge a juror for cause on the grounds that:
(2) The juror is not impartial, whatever the cause of his impartiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
In this case, defendant challenged Dixon and Smith on the basis of their relationship with the victim and Thornhill on the basis she had formed an opinion about the defendant's guilt.

1. Linda Judy Dixon

Dixon stated in voir dire that the man that was killed was seeing a childhood friend of her daughter, Kelly Trichel, and that her daughter also works with Trichel's sister. Voir dire also revealed that Dixon's daughter was married to Trichel's cousin. When asked if she had heard about the murder, Dixon replied she probably heard the specifics of the murder from her daughter but could no longer recall any of the details. Dixon did not know either the victim or the defendant personally.
The pertinent part of the questioning of Dixon by the prosecutor is excerpted as follows:
Q. Would this ... would these connections, the knowledge of these people and knowing who they are and their connection to Mr. Ferguson cause you any undue influence in this case?
A. It might.
Q. If the judge tells you, ... that you're only to consider as evidence in the case in deciding Mr. Allen's guilt or innocence what you hear from the witness stand, the testimony, the other evidence, documents, exhibits, whatever, that that's all you are to consider in this case do you think you could put out ... put aside those other ... that other knowledge?
A. I would like to think I could.
Defense counsel then inquired into whether Dixon had formed an opinion about the case when she discussed it with her daughter. This discussion is excerpted as follows:
Q. Did you form an opinion at that time, or do you have any opinion now?
A. I feel that if Kelly would have been there she would have been in danger and possibly that would have ... that would affect my thinking, I don't know.
Q. Do you think you would be able to sit on this jury and render a fair and impartial decision.
A. Based on what I hear I would like to think I would but I just don't know, I don't know.
The prosecutor then questioned Dixon as follows:
Q. Ms. Dixon I just have a couple of follow up questions. Mr.... it's often difficult to answer these kinds of questions *724 when you hadn't heard the evidence yet, and do you feel you could wait and make up your mind as to this man's guilt or innocence until after you've heard all that evidence?
A. Yes.
At this point, defense counsel made his cause challenge. The fact a juror has a relationship with the victim is not itself enough to sustain a challenge for cause. State v. Bourque, 622 So.2d 198 (1993). This court stated in State v. Clark, 340 So.2d 208, 215 (La.1976), cert. denied, 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977), that even where a prospective juror knows the victim, the defense must show the juror's acquaintance with the victim is such that it is reasonable to conclude it would influence the juror in arriving at a verdict to be a sufficient ground for a challenge for cause. A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); State v. Smith, 437 So.2d 802 (La. 1983).
In this case, the questioning of Dixon concerning her relationship with the victim's girlfriend was brief. However, she never definitively stated she would be influenced by her relationship with the victim's girlfriend. Therefore, there was no evidence suggesting Dixon was biased against the defendant.
This situation is similar to the one considered by this court in Bourque. Bourque involved a cause challenge to a juror on the basis that the juror's sister was the physical therapist treating the shooting victim involved in the case. This victim was also the mother of the girl whose murder the defendant was on trial for. This court found no evidence that any information the potential juror had obtained from his sister would prevent him from being a fair and impartial juror. In State v. Sonnier, 379 So.2d 1336 (La.1979), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), a prospective juror stated that her niece was married to the murder victim's brother and that her parents were old friends of the other murder victim's family. Voir dire also revealed that one of the murder victims had worked for the juror's brother. This court held the defense failed to show the juror's acquaintance with the victims would influence her verdict.
The record before this court fails to show Dixon's connection to the victim would have influenced her decision. Therefore, the trial court did not abuse its discretion in denying the defendant's cause challenge.

2. Clifton Smith

Potential juror Smith was challenged for cause based on the fact that he knew the victim and Mary Messick (co-owner of the Cherokee Club with the victim). Smith also stated he had known the victim for about two years and would drink beer with the victim at the Cherokee Club. According to Smith, he and the victim did not communicate with each other outside of the club. Smith did not know the defendant.
The pertinent parts of defense counsel's examination of Smith follows:
Q: Do you remember the date that on... which he was killed?
A: I don't remember the date. I remember the, you know, the cop cars and all that there and the guys that I relieved, they remembered, you know, something about it coming to work that night.
Q: Do you remember reading, in the newspaper, anything about it or hearing anything on the radio about his death?
A: No, we read about it. We talked about it out at the mill and, you know ...
Q: Uh, do you ... did you read an article in the Natchitoches Times?
A: I don't know if it was Natchitoches Times, Shreveport or Alexandria. I can't answer that.
Q: But based upon that article that you did read, the articles that you may have read, did you form an opinion as to what happened?

*725 A: Well, I guess I pretty well formed an opinion.
Q: Do you think you would be able to listen to the evidence in this case and make a determination on the evidence you hear and put aside those things that you have read in the newspaper or heard about prior to coming to court?
A: Well, I would certainly try because I know rumors get around, but ...
Q: Do you think that you'd be able to sit on a jury that was to decide the guilt or innocence of someone charged with having killed Herman Ferguson and be a fair juror?
A: Well, I would certainly try to be fair.
Q: If the State failed to convince you in this case, would you be comfortable in returning a verdict of not guilty or would that make you uncomfortable because this is someone you knew before his death?
A: No, I think ... the evidence would be, you know, is the way you'd vote.
Regarding Smith's relationship with Messick, the co-owner of the Cherokee Club, defense counsel asked Smith if he would, because of their relationship, put more weight on her testimony. Smith replied that he would try not to. Voir dire also revealed that Smith had spoken with Messick about the murder.
As stated in the above discussion of Linda (Judy) Dixon, the fact that a potential juror has a relationship with the victim is not itself grounds for a cause challenge. The fact that a juror has personal relationship with a prosecution witness is also not itself grounds for a cause challenge. State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981). Instead, it must be demonstrated that the relationship would influence the juror's verdict.
In State v. Griffin, 618 So.2d 680 (La.App. 2d Cir.1993), writ denied, 625 So.2d 1063 (La.1993), the trial judge was not in error in refusing to grant a cause challenge to a juror who knew the victim and who originally stated he thought the defendant was guilty based on what he heard about the case. The juror was rehabilitated when he stated the media was not always accurate and that he could lay his opinion aside. Further, in State v. Gibson, 505 So.2d 237 (La.App. 3d Cir.1987), writ denied, 508 So.2d 66 (La.1987), a juror who was a social acquaintance of the victim and a good friend of the victim's family was not required to be excused for cause because he stated he could decide the case based solely on the evidence. In State v. Clark, 340 So.2d 208 (La.1976), cert. denied, 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977), this court held that no cause challenge should have been granted because the victim had prepared the juror's tax returns for several years and occasionally the juror saw the victim around town. According to this court in State v. Senegal, 333 So.2d 639 (La.1976), no challenge for cause should have been granted to a juror who went to high school and used to drink beer with the victim. However, in State v. Brown, 496 So.2d 261 (La.1986), this court did hold that a juror who previously dated the victim should have been excused for cause.
The juror in this case did not have an extensive personal relationship with the victim and the record fails to show the juror's relationship with the victim would influence his verdict. The record also fails to indicate the juror's relationship with witness Mary Messick would in any way influence his verdict.

3. Cheryl Thornhill

The defendant also argues the trial court erroneously denied defense counsel's challenge for cause with respect to juror Thornhill on the basis she had formed an opinion about the case. Thornhill testified she remembered forming an opinion about the case from news reports. However, upon questioning by the trial judge, Thornhill responded she would listen to the evidence and that her opinion was not fixed. Thornhill went on to say that the incident was a "horrible thing" and that her opinion was based more on the crime itself than on the perpetrator.
Juror Thornhill was successively rehabilitated by the court and nothing in her testimony suggests she was unable to remain *726 impartial.[8] Therefore, this assignment of error is without merit.

Trial Issues

Assignment of Error No. 7
Defendant contends the trial court erred in failing to grant a mistrial after the prosecutor's opening statement adverted to defendant's confession. During his opening statement, the prosecutor said:
After Sandra left the (2) of them alone, Willard Allen left in Herman's truck, left in Herman's truck. Trusted him enough to let him borrow his truck, take it wherever he wanted to go. He came back; Herman was in his trailer next door to the club. And after a short while, he pulled a three eighty (.380) and told him, I've got something I've got to do. I want the combination to the safe.
At the time of trial, La.C.Cr.P. art. 767 provided that "[t]he state shall not; in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant." This statement does not directly mention the defendant's confession; nor does it even suggest the defendant made a confession. Details about what occurred between the victim and defendant could have been pieced together from the physical evidence, statements by witnesses or speculation by the prosecution. While the statement does supply evidence of the crime, it does not include any self incriminating statements made by the defendant. State v. Randolph, 334 So.2d 687 (La.1976). Consequently, this assignment is without merit.

Assignment of Error No. 8
The defendant maintains the trial court erred in admitting evidence not made available for inspection by the defendant pursuant to defendant's discovery motions. However, the record fails to show that the defendant was denied access to any evidence he requested. Therefore, this assignment is without merit.

Assignments of Error Nos. 9 and 10
The defendant contends the trial court impermissibly controlled the defense's order of evidence and deprived the defendant of his right to compulsory process by refusing to allow him to call Gabriel Clark as a defense witness. At the time of defendant's trial, Clark was charged as an accomplice to the armed robbery of Herman Ferguson and had not yet entered his Alford guilty plea to accessory to armed robbery. Defense counsel had requested a subpoena be issued upon Clark about a month before trial but did not notify Clark's attorney of his intent to call Clark as a defense witness. Defense counsel was aware that Clark was represented by attorney M.L. Laird. The trial judge stated:
Well, the Court, of course, can not allow you to call Mr. Clark as a witness without Mr. Laird being here. That is the ruling of the Court at this time.
Defense counsel's objection was overruled and then defense counsel rested his case.
An accused has the right to confront witnesses against him and to have compulsory process for obtaining witnesses under U.S. Const. amend. VI and La. Const. § 16. In this case, the trial judge did not prevent the defense from calling Clark as a witness; rather the trial judge demanded that Clark's attorney be notified and be present in the courtroom when Clark testified. This court ruled in State v. Ceaser, 249 La. 435, 187 So.2d 432 (1966) that neither the court nor the district attorney has the duty to inform a witness that he is entitled to advice of counsel as long as he is advised of his right against self incrimination. However, Ceaser does not stand for the proposition that a court is forbidden from requiring that the witness' attorney be notified when the witness has been subpoenaed to testify.
The trial judge did not forbid defense counsel from calling Clark as a witness. In fact, the record indicates that more time would have been granted to defense counsel to notify Clark's attorney. However, defense counsel did not request additional time and *727 chose to rest his case. Therefore, these assignments of error are without merit.

Assignment of Error No. 11
The defendant argues the trial judge violated the sequestration rule of La.C.Cr.P. art. 791 when he went into the jury room during their deliberations of the penalty phase and asked the jurors if they were ready for dinner. Defendant also maintains that the trial judge violated the rule of sequestration when the jurors informed the bailiff[9] they did not understand one of the possible verdicts and the judge entered the jury room and told the jurors they would all have to go back into court to have the rule read to them.
La.C.Cr.P. art. 791 provides in pertinent part that a jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication. The case of State v. Orgeron, 512 So.2d 467 (La.App. 1 Cir.1987), writ denied, 519 So.2d 113 (La.1988), held the rule of sequestration was not violated by the trial judge's temporary presence in the jury room to take the dinner orders of the jurors. In this case, all of the testifying jurors stated they were not influenced by the judge's presence in the jury room.
The rule of sequestration does not "bar communication between the judge and jury when such communication is within the bounds of trial related necessity." State v. Copeland, 419 So.2d 899, 906 (La.1982), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). Communications between the judge and jury concerning the jury's confusion over the possible verdicts was clearly within the bounds of trial related necessity. Therefore, this assignment of error lacks merit.

SENTENCING PHASE

Assignment of Error No. 12
The defendant contends the trial court erred by not compelling the prosecutor to make an opening statement during the penalty phase in violation of La.C.Cr.P. arts. 766 and 905.2. La.C.Cr.P. art. 766 provides the opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge. La.C.Cr.P. art. 905.2 provides in pertinent part that insofar as applicable, the sentencing hearing shall be conducted according to same procedure as provided for trial in the Code of Criminal Procedure.
This court has stated that as far as applicable, both the procedure and order of the sentencing hearing should conform to that of the trial. State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). According to the jurisprudence concerning La.C.Cr.P. art. 766, one of the functions of the opening statement is to acquaint the jury with the case so they may better understand the evidence and to protect the defendant from being taken by surprise or prejudiced in the preparation of his defense. State v. Bolen, 338 So.2d 97 (La.1976); State v. Roquemore, 292 So.2d 204 (La.1974), rev'd on other grounds, State v. Holmes, 347 So.2d 221 (La.1977). The scope and extent of the opening statement is left to the sound discretion of the trial judge. State v. Clark, 231 La. 807, 93 So.2d 13 (1957), rev'd on other grounds, State v. Lee, 346 So.2d 682 (La. 1977).
In this case no useful purpose would have been served by an opening statement in the sentencing phase. Furthermore, the prosecutor did tell the court he would like to offer and introduce by reference all of the trial testimony and a photograph of the victim with his daughter as evidence to support his claim of aggravating circumstances. Prior to this statement by the prosecutor, the trial court had explained the aggravating and mitigating factors to the jury and provided them with a roadmap of the sentencing proceeding. The defendant cannot show unfair *728 surprise or prejudice as he was given notice before trial of the two aggravating circumstances which the state intended to prove. Consequently, this assignment lacks merit.

SENTENCE REVIEW
Article I, § 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.C.Cr.P. art. 905.9 provides that this court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28 § 1 which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(a) Passion, Prejudice or any other Arbitrary Factors
The defendant did not argue that any arbitrary factors were introduced at trial or in the penalty phase. A review of the record fails to reveal any evidence that passion, prejudice or any other arbitrary factors influenced the jury in its recommendation of the death penalty.

(b) Statutory Aggravating Circumstances
The jury in its verdict found the following aggravating circumstances:
(a) the offender was engaged in the perpetration of armed robbery (La.C.Cr.P. art. 905.4(A)(1));
(b) the offense was committed in an especially heinous, atrocious or cruel manner (La.C.Cr. P. art. 905.4(A)(7)).
It is undisputed that the defendant was engaged in the perpetration of an armed robbery at the time the offense was committed.[10] It is well-settled that the failure of one statutory aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceeding. State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190, 201. The judge instructed the jury that the State's claim that the offense was committed in an especially heinous manner was based on the fact that the offender shot the victim six times at close range and that the victim had given the defendant numerous opportunities to perpetrate the armed robbery without violence. All the evidence pertaining to this claim had been introduced during the guilt phase of the trial. The State did not present any new evidence on this issue; therefore no arbitrary factor was introduced into the sentencing phase of the trial.

(c) Proportionality to the Penalty Imposed in Similar Cases
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28 § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976 in the district in which the sentence was imposed. The state's list in this case reveals that only five first-degree murder cases were tried in the Tenth Judicial District (consisting of Natchitoches Parish) since January 1, 1976. Jurors in Natchitoches Parish have recommended the death penalty on two occasions.[11]
*729 There have been two cases in the Tenth Judicial District that are similar to this case. The first, State v. Bobby Ray Demars,[12] Number 44,072, resulted in a life sentence. The second, State v. Hamilton, Number 91-5048 resulted in a death sentence[13]. Based upon these two cases, it is difficult to perform a proportionality review in this case. Consequently, it is appropriate to look beyond the judicial district where the sentence was imposed and conduct a proportionality review on a state-wide basis. State v. Percy Davis, 92-1623 (5/23/94), 637 So.2d 1012, 1030-31, cert. denied, ___ U.S. ___, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). The cases are legion in which this court has affirmed a death sentence based primarily on the jury's finding that the defendant was engaged in the perpetration of an armed robbery at the time he committed the murder. See, e.g., State v. Scales, 93-2003 (La. 5/22/95), 655 So.2d 1326, cert. denied, ___ U.S. ___, 116 S.Ct. 977, 133 L.Ed.2d 897 (1996); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Messiah, 538 So.2d 175 (La.1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990).
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate the defendant is a white male born on March 1, 1957. He was 36 years old at the time of the offense. Defendant has been married twice to the same woman and they have three children, ages 17, 14 and 12. The defendant did not complete high school but has an I.Q. of 100. The defendant's psychiatric evaluation revealed the defendant is chemically dependent and has experienced chronic depression for many years. According to the evaluation, the defendant was abusing alcohol and drugs at the time of the offense. The defendant has worked in the oil and gas industry for years. However, in January of 1992, the defendant injured his back and was forced to quit his job. The defendant has no prior criminal history.
After having considered the above factors, we are unable to conclude that imposition of the death sentence in this case is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Hence, based on the above criteria, we do not consider that defendant's death sentence constitutes cruel, excessive, or unusual punishment.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition to the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, Justice, dissenting.
I respectfully dissent from the conclusions reached by the majority in allowing both the conviction and penalty to stand in this matter. The evidence in this case shows that relator's Assignment of Error No. 6 has merit because certain perspective jurors should have been excused for cause, but were not.

LINDA (JUDY) DIXON
Based on her responses, the record shows the trial court erred when it failed to excuse venireperson Linda Dixon for cause. Not only did this witness inform the court of the connexity between her family and the victim, her answers proved that she was unable to follow the law. The following colloquy was elicited during voir dire concerning the relationship *730 existing between Ms. Dixon and the victim:
(by the prosecution)
Q. Do you know of reason that you can think of Ms. Dixon why you could not serve as a juror in this case?
A. There's one thing you all would probably would want to be aware of, the man that was killed was seeing a childhood friend of my daughter and my daughter also works with her sister. So if that would be something you would need to be aware of that's the case?
When asked if this connection to the victim could cause her any undue influence, Ms. Dixon was unable to adamantly respond either in the affirmative or negative, but stated that "it might".
Also, when asked by defense counsel if she agreed with the law concerning evidence taken in violation of the law, she said that she was unable to so. The following exchange took place:
Q. I mentioned the exclusionary rule earlier, that is a rule that says if evidence is taken in violation of some law then it is not to be used in a trial, do you agree with that rule?
A. No.
Q. You think that we should do away with that rule and the evidence should be used and we should do something else about the violation of law?
A. Yes.
Finally, this perspective juror admitted that she had formed an opinion (if her daughter was involved) and was unsure whether or not she could render a fair and impartial decision. Clearly, the defense properly challenged Linda Dixon for cause and it was error to deny their challenge.

CLIFTON SMITH
The evidence in this case reveals that venireperson Clifton Smith knew both the victim and a potential witness, Mary Messick who was the co-owner of the Cherokee Club with the victim. Mr. Smith stated that he would regularly see the victim when he would stop at the club for beer. He further stated that he had known the victim for approximately 2 years and that he (victim) would come over and sit at his table with him when he patronized their business.
Defense counsel asked Mr. Smith if he had read about this murder and if he had formed an opinion. In response, this prospective juror stated that he had read about the murder, talked about it at his place of employment, and "guess" he formed an opinion. Finally, when asked if he was able to put aside those things he read in the newspaper or heard about, and listen to the evidence in the case and make a determination based on the evidence, he only stated that he "would certainly try because rumors get around, but ..." Just as the defense attempted to challenge Ms. Dixon for cause based on her responses, the responses elicited from Mr. Smith show that there was ground to excuse him for cause. First of all, he and the victim were socially acquainted for nearly 2 years prior to this murder, and his answers show that he had formed an opinion.
The requirements for excusing a juror for cause are listed in La.C.Cr.P. art. 797. In pertinent part, this article provides:
The state or the defendant may challenge a juror for cause on the grounds that:
(2) The juror is not impartial, whatever the cause of his impartiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, ... is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court;
Under the language provided above both Dixon and Smith should have been excused. They both admitted that they had formed an opinion about the case. Also, they admitted that a relationship existed between themselves *731 and the victim. Smith stated that he and the victim were friends. Although their relationship was not as close as the one between Smith and the victim, Dixon stated that they (she and her daughter) were related to the family and that this connection might influence her. Finally, both jurors gave rather "weak" responses when asked if they could follow the law. While a charge of bias may be removed if the prospective juror is rehabilitated and if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court, here, the record shows that neither of these jurors were sufficiently rehabilitated.[1] In fact, venireperson Dixon stated that she just didn't know if she could render a fair and impartial decision.
Our jurisprudence states that prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantive rights and constitutes reversible error. State v. Maxie, 653 So.2d 526 (La.1995); State v. Robertson, 630 So.2d 1278 (La.1994); State v. Ross, 623 So.2d 643 (La. 1993). To prove reversible error warranting reversal of both the conviction and sentence, the defendant needs to show: (1) erroneous denial of a challenge for cause; and, (2) use of all peremptory challenges. Defendant exhausted all of his exemptory challenges. Applying these principles of law to the instant matter, it is clear that defendant's challenges for cause were erroneously denied. Because the death penalty is an absolute and final resolution, this court should set aside both the conviction and sentence, and remand the case for a new trial.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] Subsequent to defendant's trial, Clark entered an Alford guilty plea to accessory to armed robbery. See North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). He was sentenced to three years at hard labor with credit for time served.
[2] Defendant's writ for pre-trial review of this issue was denied by a vote of 5-2. State v. Allen, 94-2071 (La. 09/30/94), 642 So.2d 882. That pre-trial ruling does not foreclose reconsideration of this issue. State v. Fontenot, 550 So.2d 179 (La.1989). In taking a second look, the court may consider all pertinent evidence given at the trial. State v. Burkhalter, 428 So.2d 449, 455 (La.1983); State v. Merchant, 490 So.2d 336, 339 n. 2 (La.App. 1 Cir.), writ denied, 496 So.2d 326, (La.1986).
[3] The actual issue in Davis, 407 So.2d at 669, was whether there was probable cause to arrest Davis for auto theft. This Court noted, however, that "[e]ven assuming, for the sake of argument, that probable cause, as such, did not exist, there were certain facts which clearly warranted the stopping" of the defendant.
[4] The defendant in this case was given a Miranda rights warning prior to the first interview.
[5] The search of the car occurred before the questioning at the substation. Therefore, it could not have possibly been tainted by any actions taken at the substation.
[6] The record shows Phythian had attended no professional seminars and had only attended two workshops. He was also still working towards his bachelor of arts degree and lived at the Kappa Sigma Fraternity House at Northwestern State University.
[7] This issue was the subject of a writ application in this court which was unanimously denied. State v. Allen, 94-KK-2521 (10/14/94), 643 So.2d 166.
[8] It should be noted that Thornhill actually served on the jury while Dixon and Smith were peremptorily excused by the defense.
[9] The record as a whole indicates the trial judge came into the jury room after the jury told the bailiff they were having problems. However, the testimony of one juror does not refer to the fact that the jury informed the bailiff of their problem. According to his testimony, the judge just entered the jury room and asked if they were having any problems.
[10] Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64. In this case, the evidence clearly supports the jury's finding that the defendant was engaged in the perpetration of an armed robbery when the killing occurred.
[11] In one case, State v. Lee, 559 So.2d 1310 (La.1990), the death sentence was vacated on rehearing and a new sentencing hearing was ordered; however, the death penalty was reinstated at the second sentencing hearing. In the second case, State v. Hamilton, No. 91-5048, the case has been remanded to the trial court for further evidentiary proceedings.
[12] This case was reported by the District Attorney of Natchitoches Parish in his summary of all the first degree murder cases in Natchitoches Parish since 1976. However, this case is not reported at the appellate level.
[13] Hamilton is currently on remand to the trial court for further evidentiary proceedings.
[1] See State v. Gibson, 505 So.2d 237 (La.App. 3 Cir.1987), writ denied, 508 So.2d 66 (La.1987).