721 So.2d 458 (1998)
Neil HARRISON, et al.
v.
STATE of Louisiana, Through the DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS and Office of State Police, et al.
Nos. 97-C-1086, 97-C-1125.
Supreme Court of Louisiana.
December 1, 1998.
Rehearing Denied January 15, 1999.
Edward Hart Bergin, New Orleans, for Applicant in No. 97-C-1086.
Henry L. Klein, New Orleans, Harry Karl Burdette, Richard P. Ieyoub, Baton Rouge, for Respondent in No. 97-C-1086.
Harry Karl Burdette, Richard P. Ieyoub, Baton Rouge, for Applicant in No. 97-C-1125.
Henry L. Klein, Edward H. Bergin, New Orleans, for Respondent in No. 97-C-1125.
VICTORY, J.[*]
We granted these writs to determine whether Harrah's Casino Shreveport ("Harrah's") and the Louisiana State Police are liable for false arrest for detaining two casino patrons for questioning whom Harrah's and the State Police suspected of cheating, or abetting a cheater, while playing blackjack. After reviewing the record and the applicable *459 law, we reverse the ruling of the court of appeal and find that neither Harrah's nor the State Police are liable.

FACTS AND PROCEDURAL HISTORY
Neil Harrison ("Harrison"), Larry Reeves ("Reeves"), Wayne Shaw ("Shaw"), and Kenneth Romero ("Romero") went to Harrah's casino on the afternoon of April 21, 1994, Harrah's second day of operation. Harrison, Reeves, and Shaw were Texas businessmen who owned racehorses and Romero trained racehorses. The four men were inexperienced gamblers who went to Harrah's together to celebrate the victory of a race horse owned by Reeves and trained by Romero at Louisiana Downs that morning.
There were seven betting circles and six chairs arranged in a semi-circle around Table 115, where the four men were playing blackjack. They were positioned around Table 115 as follows: Harrison was seated at the far left in front of Betting Circle No. 1; Shaw was seated next to him in front of Betting Circle No. 2; Dan Trout was seated next to Shaw in front of Betting Circle No. 3; Reeves was standing behind and to the right of Trout in front of Betting Circle No. 4; and Romero was sitting next to Trout in front of Betting Circle No. 5.
At approximately 4:10 p.m., the casino manager's attention was directed toward Table 115 when she noticed that Trout was betting with $100.00 black chips. While observing Table 115, she testified that she noticed the following suspicious activity: Trout's chips were in disarray and that his hands were positioned very close to the betting circle; there was a lot of passing around of chips between Reeves, Romero, Harrison, Shaw, and Trout; all five players were leaning in towards the betting circles; they were all talking to each other and "high-fiving" each other; and, the dealer looked nervous and flustered. The casino manager then called Harrah's surveillance unit and asked that they monitor Table 115 by video camera to determine whether the players at Table 115 were cheating.
The lead man in the surveillance department observed Table 115 by live video and noticed that Trout was "capping" bets.[1] He also noticed that Trout was betting for Reeves, making change with Reeves' chips, and interacting with Reeves and Romero, and that Reeves and Romero were interacting with Harrison and perhaps Shaw. He then notified the casino manager and the State Police, who had an office in the casino right next door to the Harrah's surveillance office.
Trooper Mark Wise and Sergeant Lee Kavanaugh of the State Police were on duty that afternoon. At approximately 4:20 p.m., they walked to the surveillance office and viewed live video of Table 115 and the tape that the Harrah's surveillance department had viewed. They noticed the above mentioned activity[2] as well as Trout actually capping a bet for Reeves and then Reeves removing the black chip after the hand had ended in a tie with the dealer. After about 15-20 minutes of reviewing the tapes, they determined that Trout was cheating and suspected that Reeves, Romero, Harrison and possibly Shaw were intentionally or unintentionally acting as "boomers" for him.[3] Accordingly, the State Police decided to arrest Trout and to question Romero, Reeves, Harrison and possibly Shaw.
The State Police officers called in several of Harrah's guest safety officers and informed them of their plan to arrest Trout *460 and question the others about Trout's cheating. The Harrah's officers had been instructed by the casino manager to provide assistance to the troopers and to handle the situation quietly, cleanly and calmly without disturbing the other gamblers.
At approximately 4:40 p.m., Wise and Kavanaugh, along with several Harrah's officers, approached Table 115. Wise identified himself as a State Police officer and arrested and handcuffed Trout. Kavanaugh identified himself as a State Police officer and told the other players to put their hands on the table and not to touch their chips. Kavanaugh questioned Shaw, who lied and told him that he did not know any of the other players. Kavanaugh then asked Romero, Harrison, and Reeves to accompany him to the dispatch office so that he could ask them some questions. He motioned to Harrison to follow him and then led him out of his chair by the arm. From the video, it appears that they all went peacefully and voluntarily, although Romero testified that they cursed and threatened him and told him he was under arrest. The officers testified that they did not tell them that they were under arrest and in fact told them several times that they were not under arrest. Reeves, Romero, Harrison and Trout, the State Police officers and the Harrah's security officers then walked several steps behind the table into an elevator. After the elevator failed to operate, they got off and walked several more steps to the staircase leading to the dispatch office. There, the officers read Reeves, Romero, and Harrison their Miranda rights, told them not to talk among themselves, and left a Harrah's security officer in the room with them.
After Wise had interviewed Trout, who said he did not know the other three, one of the officers interviewed Reeves, Romero, and Harrison separately for approximately 15 minutes each right outside of the dispatch office. All three denied knowing anything about Trout's cheating and denied interacting with Trout. After Reeves denied knowing that Trout was betting with his chips and asked that the officer review the tape again, the officer did so and reconfirmed to Reeves what he had noticed the first time, that is, that Trout was betting with Reeves' chips clearly within Reeves' view. He then interviewed Reeves again. Approximately one and one-half hours after the State Police had approached the table, Reeves Romero, and Harrison were told that the police were going to retain their chips and that if they were going to be charged with any offense, their chips would be retained as evidence. If not, they could pick up their chips at a later date. Subsequently, they were notified that their chips were being released and they were never contacted again in conjunction with this incident.
Reeves, Harrison, Romero, and Shaw filed this action alleging that they were falsely arrested by Harrah's and the State Police. After hearing the evidence and viewing several hours of surveillance tapes,[4] the trial judge concluded that the State Police and Harrah's did not have reasonable cause to justify escorting them away from the table and detaining them for one and one-half hours, which he found amounted to an arrest. Noting that Shaw, whose suit was dismissed voluntarily before trial because he was not unreasonably detained, was questioned at the table and was released when he asserted he did not know Trout or the others, the judge observed that the other three men "did not do anything differently than had Mr. Shaw" and clearly had not capped any bets themselves. The trial judge awarded $10,000 to each plaintiff against Harrah's and the State Police, reasoning that plaintiffs were embarrassed and that their interest in maintaining their reputations for honesty was especially important because they are involved in the horse racing business in which cheating of any nature is not tolerated.
The court of appeal, in an unpublished opinion, affirmed the judgment in favor of Romero and Harrison, but reversed as to Reeves. As to the liability of the State Police, who made the decision to take plaintiffs *461 into a private area and detain them, the court concluded that the conduct of Harrison and Romero warranted, "at most, ... brief questioning at the table," which was the procedure employed in questioning Shaw. The court observed that "[t]he act of escorting Mr. Harrison and Mr. Romero away, accompanied by an entourage of casino security, exceeded the parameters of a brief detention based upon the information that the officers possessed at that time." The court further observed that an arrest occurred because plaintiffs were involuntarily interrogated for an extended period, were told not to talk among themselves, felt they were not free to leave[5], and were guarded by security officers throughout the detention.
As to Harrah's liability, the court of appeal pointed out that the blackjack dealer did not advise plaintiffs that they were violating any house rules; that the first dealer was inexperienced and was replaced five or ten minutes before the securing of the table; that the second and more experienced dealer confronted Trout directly when she saw him attempt to cap a bet, after which there was no more cheating; and that Harrah's supplied the security personnel who stood guard over the men while they were detained. The court therefore concluded that Harrah's contributed to the circumstances that resulted in plaintiffs' improper detention.
As to Reeves, the court distinguished his conduct from that of the other plaintiffs, pointing out that Trout and Reeves were in constant communication with each other, that they were exchanging chips, and that Trout bet for Reeves. The court pointed out that Trout capped a bet for Reeves and that thereafter, Reeves removed the "illegally obtained chip." Thus the court found that the officers had a sufficient basis for extensive detention and interrogation of Reeves.
We granted writs filed by Harrah's and the State Police to determine whether the lower courts were correct in finding them liable. Harrison, et al. v. State of La., Through the Dept. of Public Safety and Corrections and Office of State Police, et al., 97-C-1086 c/w 97-C-1125 (La.6/20/97), 695 So.2d 1340.

DISCUSSION
In order for plaintiffs to recover for false arrest, they must prove that they were unlawfully detained by the police against their will. Kyle v. City of New Orleans, 353 So.2d 969, 971 (La.1977); Wells v. Johnston, 52 La. Ann. 713, 27 So. 185, 189 (1898). Undoubtedly Harrison and Romero were detained, but the paramount issue in this case is whether that detention amounted to an arrest without a warrant pursuant to Louisiana Code of Criminal Procedure Article 213(3) or a stop and detention pursuant to Article 215.1. To arrest an individual without a warrant under Article 213(3), a police officer must have "reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer."[6] No one disputes that the State Police did not have reasonable cause to arrest Harrison and Romero. Therefore, if the detention amounted to an arrest, then the detention was unlawful. Instead, the State Police and Harrah's assert that Harrison and Romero were detained pursuant to Article 215.1A, which allows a police officer who has a "reasonable suspicion" that a person "is committing, has committed, or is about to commit an offense," to stop the person and demand the person's name, address and an explanation of his actions. Although the trial court found that the defendants did not have reasonable cause to detain the plaintiffs for one and one-half hours, the court did not go through any legal or factual analysis in determining whether the plaintiffs had been arrested or stopped and detained under Article 215.1.
In Terry v. Ohio, the United States Supreme Court first recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable *462 cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The Court held that even though an investigatory stop was a "seizure" under the Fourth Amendment, such a stop would be valid in certain circumstances where the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id., 392 U.S. at 21, 88 S.Ct. 1868. The Court left open "the constitutional propriety of an investigative `seizure' upon less than probable cause for purposes of `detention' and/or interrogation" but noted that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a `seizure' has occurred." Id., 392 U.S. at 20, n. 16, 88 S.Ct. 1868.
Limitations on the type of seizures that will be permitted on suspicion short of probable cause were set forth in Florida v. Royer as follows:
The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. (Cites omitted.) It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.
460 U.S. 491, 500, 103 S.Ct. 1319, 1325-1326, 75 L.Ed.2d 229 (1983).
Louisiana's statute authorizing investigatory stops on less than probable cause and the jurisprudence thereunder are in line with the above constitutional guidelines set forth by the United States Supreme Court. La.Code Crim. Proc. art. 215.1 A provides:
A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
Under La.Code Crim. Proc. art. 215.1, "although the purpose of the stop is limited and the duration is brief, an investigatory stop constitutes a `seizure.'" State v. Moreno, 619 So.2d 62, 65 (La.1993) (citing State v. Bolden, 380 So.2d 40 (La.1980); Terry v. Ohio, supra; United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (A person is seized under the Fourth Amendment when a reasonable person would think that he was not free to leave.)). Further, an unreasonable seizure of a person for investigatory purposes is prohibited by the Fourth Amendment. State v. Bell, 334 So.2d 385 (La.1976). Therefore, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity, or there must be reasonable grounds to believe that the person is wanted for past criminal conduct." State v. Moreno, supra at 65 (citing Moresi v. State, Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1086 (La.1990)) (citing U.S. v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). "Based on the totality of the circumstances-the whole picture-the detaining officers must have particularized and objective basis for suspecting the particular person stopped of criminal activity." Id.
The facts of this case clearly show that the State Police officers had reasonable suspicion to make the initial investigatory stop of Harrison and Romero at the blackjack table. The State Police reasonably suspected, based on their observations of Table 115, that Harrison and Romero might be acting as "boomers" for Trout. However, Harrison and Romero argue that although the State Police may have been justified in stopping them at the table and asking them some questions, when the State Police asked them to accompany them upstairs to the dispatch office and detained them for one and one-half hours, this escalated the initial stop into an arrest for which probable cause is required. We disagree.
The length of time Harrison and Reeves were detained does not automatically convert the investigative stop into an arrest. The *463 United States Supreme Court has refused to adopt any outside time limitations for a permissible investigative stop.[7]See U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (holding that a 90 minute non-consensual detention of defendant's luggage was violative of the Fourth Amendment in the absence of probable cause). Instead, the Court has developed the following test: "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." U.S. v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." Id., 470 U.S. at 687, 105 S.Ct. at 1576; see also State v. Fauria, 393 So.2d 688, 690 (La.1981) ("Inherent in the officer's right to stop a suspect and demand his name, address, and an explanation of his actions is the right to detain him temporarily to verify the information given or to obtain information independently of his cooperation.").
In this case, the officers intended to question plaintiffs to find out what they knew about Trout's cheating. They had three men to question and only one officer to question them (the other officer was with Trout) and they needed to be questioned independently so that they would not be able to confer with each other with regard to their answers. When Reeves denied knowing that Trout was using his chips to bet and suggested that the officer look at the tape again to make sure, one officer had to go back and review the tape before he could continue questioning Reeves. Thus, this detention is valid under the standards enunciated in by the United States Supreme Court in that it was temporary, lasted no longer than was reasonably necessary to determine if Harrison and Romero and the others were acting intentionally or unintentionally as "boomers" for Trout, and the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. That Harrison and Romero were not arrested is exceedingly clear when comparing their detention to the treatment of Trout, who was told he was under arrest, led away from the table in handcuffs, later taken to jail, criminally charged and convicted. In addition, the court of appeal's finding that they could have questioned Reeves and Harrison at the table just as they did Shaw is not dispositive because in light of the totality of the circumstances, they did not act unreasonably in failing to pursue that option. See U.S. v. Sharpe, supra, 470 U.S. at 687, 105 S.Ct. at 1576. Further, the defendants argue that if Shaw had not lied about his relationship with Reeves, Romero, and Harrison, he too would have been asked to go upstairs for questioning.
Moreover, the mere fact that an individual is moved from the place of the initial stop to another location does not necessarily mean an arrest has occurred. See Florida v. Royer, supra, 460 U.S. at 504, 103 S.Ct. 1319 (holding that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area," but holding in that case that "[t]he record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room ...").
For example, in State v. Allen, the defendant was initially stopped in the parking lot next to the police station. 95-1754, 682 So.2d 713 (La.9/5/96). A murder had occurred in the area and the police had information linking *464 the defendant to the crime. After the defendant consented to a search of his car, the officers found a gun in his trunk. The defendant was verbally informed of his Miranda rights and asked to accompany the officers next door to the substation for more questioning. We held that "the fact the defendant was questioned in the station house does not mean there was a formal arrest. Instead, for a formal arrest to have occurred, there must have been a restraint on the defendant's freedom of movement." Id. at 720. No arrest occurred because "the defendant voluntarily accompanied the deputies to the substation" and there was "no evidence suggesting [he] was not free to terminate the interview at anytime and leave." Id. "Therefore, there was no restraint on defendant's freedom." Id. See also United States v. Mendenhall, supra (where a majority of the Court validated a search of the defendant, with two justices finding, in a split opinion, that no seizure occurred where DEA agents stopped the defendant at the airport because he fit the "drug courier profile," and asked to see his ticket and identification and then asked that he accompany him to the DEA office at the airport, which he did voluntarily, and with three justices in the majority finding that an investigative stop occurred for which the agents had the requisite reasonable suspicion); cf. State v. Moreno, supra ( holding that when police officers took the defendant into custody at the airport and forced her to walk toward their office on the second floor in order to obtain a search warrant after she refused to submit to a search of her body, the officer exceeded the limited bounds of an investigatory stop).
In this case, the officers had reasonable suspicion that Harrison and Romero were acting as boomers for Trout. This justified the initial stop at the blackjack table. Then, rather than question the three men in the middle of a crowded and loud casino, the officers led them to a private area for questioning. Stairwell access to the private area was only a few feet away from the table. Harrison and Romero were not forced to go to the dispatch room, they went voluntarily.[8] One officer had to separately interview all three men and had to review the tapes in light of their answers to verify or dispel their suspicions. Thus, there were "legitimate law enforcement purposes which justified the detention in the first place [which] were furthered by removing [Harrison and Romero] to the [dispatch area]." Florida v. Royer, supra.

CONCLUSION
Viewing the totality of the circumstances, namely, that the casino floor was loud and crowded, that three men needed to be questioned independently by one officer, that the men initially denied knowing anything about Trout's cheating and denied interacting with him, and that the officers needed to review the tapes and question the entire group in order to verify or dispel their suspicions, the detention of Romero and Harrison was a valid investigatory stop under La.Code Crim. Proc. art. 215.1. Although the detention may have been an inconvenience and an embarrassment to Harrison and Romero, the detention was not unlawful and therefore the State Police are not liable for false arrest. Because the detention was not unlawful, Harrah's is also not liable.[9]

DECREE
For the reasons stated herein, the decisions of the trial court and court of appeal holding the State Police and Harrah's liable for the false arrest of Harrison and Romero are reversed and the plaintiffs' complaint is dismissed.
REVERSED.
LEMMON, J., concurs in part and dissents in part and assigns reasons.
*465 LEMMON, J., concurring in part and dissenting in part.
I agree with the majority's holding that Harrah's is not liable. I disagree, however, with the majority's holding that the Office of State Police is not liable. Particularly, I disagree with the majority's conclusion that the State Police officers did not arrest Harrison and Romero under the version of the incident found credible by the trier of fact. For the following reasons, I conclude that the officers' conduct amounted to a false arrest of Harrison and Romero and would thus affirm that portion of the judgments of the lower courts.

False Arrest
The tort of false arrest or false imprisonment occurs when one intentionally and unlawfully arrests or totally restrains another against his or her will. Kyle v. City of New Orleans, 353 So.2d 969, 971 (La.1977). An early decision of this court set forth two elements necessary to establish the tort of false arrest: (1) involuntary detention of the person, and (2) the unlawfulness of such detention. Wells v. Johnston, 52 La. Ann. 713, 27 So. 185, 189 (1898). The unlawfulness of the detention is the gravamen of the offense; neither malice nor ill will is required. Id. This tort is based on the fault concept embodied in La. Civ.Code art. 2315. See Fontenot v. Lavergne, 365 So.2d 1168 (La.App. 3d Cir.1978).
The gist of the tort of false arrest is wrongful and willful detention imposed by the defendant. Stuart M. Speiser et al., The American Law of Torts § 27:1 (1990). Undisputedly, Romero and Harrison were detained without a warrant by the State Police. The critical issue, on which the evidence was in dispute, is whether they were detained against their will.

Liability of State Police
The State Police cite as a basis for the legality of the detention La.Code Crim. Proc. art. 215.1, and argue that they had the "reasonable suspicion" required by La.Code Crim. Proc. art. 215.1 A[1] to detain plaintiffs in order to question them about their relationship with Trout. The State Police point out that they observed the conduct of Trout and plaintiffs on monitors live and on videotape, and saw interaction that included Trout's betting for Reeves, teaching two plaintiffs to play blackjack, and making change with plaintiffs' chips. According to this defendant, plaintiffs were behaving in a boisterous manner suggestive of an attempt to distract attention from Trout's cheating.
Article 215.1 A, which requires "reasonable suspicion" that a person "is committing, has committed, or is about to commit an offense," only authorizes a law enforcement officer to stop the person and demand the person's name, address and explanation of his or her actions, such as occurred with plaintiff Shaw. The article further contemplates a brief investigatory detention to verify the information obtained or to obtain information independently. State v. Fauria, 393 So.2d 688, 690 (La.1981). However, when an extensive detention for questioning essentially amounts to an arrest, as found by the court of appeal in the present case, the law enforcement officer must have more than "reasonable suspicion."
La.Code Crim. Proc. art. 213(3),[2] cited in many false arrest cases, authorizes a peace officer to arrest a person without a warrant when the officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. Reasonable cause in this context is the equivalent of probable cause, which exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable *466 and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Simms, 571 So.2d 145, 148 (La.1990).
Accordingly, as even the majority acknowledges, the outset question in determining the liability of the State Police is whether an arrest of Harrison and Romero occurred. If so, the State Police must have had reasonable cause or probable cause to effect the arrest; if not, reasonable suspicion was sufficient.
An arrest occurs when one person is taken into custody by another through imposition of actual restraint, either by force or by submission of the arrested person to custody. La.Code Crim. Proc. art. 201. The determination of whether an arrest occurred depends on the totality of the circumstance. State v. Allen, 95-1754 (La.9/5/964), 682 So.2d 713. A prime factor in the determination is whether a reasonable person under the circumstances would consider himself or herself free to leave. State v. Moreno, 619 So.2d 62, 65 (La.1993) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Ultimately, whether a person has been arrested depends on circumstances indicating an intent to impose an extended restraint on the person's liberty. Simms, 571 So.2d at 148.
A reviewing court must accord great deference to the factual findings of the trier of fact, whether jury or judge, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). This well-settled principle of review is based not only on the trial court's better capacity to evaluate witnesses, but also on the proper allocation of trial and appellate functions between the respective courts. Id. The determination of whether there was such an extended restraint on a person's liberty as to constitute an arrest is largely a factual finding, based on evaluations of credibility and inferences drawn from the testimony of the witnesses and other evidence.
In the present case, the trial judge heard the live testimony and reviewed the videotapes observed by the State Police. While the State Police point out inconsistencies in the testimony of plaintiffs and their witnesses, these certainly were argued to and considered by the trial judge, who credited plaintiffs' evidence. The principal inquiry is whether there was credible evidence to support the trial judge's conclusions.
Trooper Mark Wise testified that he and Sergeant Lee Kavanaugh, after observing the conduct of Trout and the three plaintiffs on videotape and live on the monitors for twenty to thirty minutes, decided to arrest Trout and to question the three plaintiffs. When the troopers and Harrah's security officers arrived at Table 115, they told Trout he was under arrest, but told the others at the table only to keep their hands on the table and not to touch the chips. Both Wise and Kavanaugh denied that they told any of the three plaintiffs they were under arrest. Because they had seen no interaction between Trout and Shaw or the unidentified other players at the table, the troopers only asked these players if they knew Trout and released them upon receiving negative responses, but took their names and addresses from driver's licenses for use in further investigation.
According to Wise, he had only two questions for plaintiffs: (1) whether they knew Trout and (2) whether they had seen Trout cheating. Nevertheless, he "asked" Harrison, Romero and Reeves to accompany him to a private area of the casino. According to Wise, they voluntarily went with him because they were anxious to clear their names; he told them several times they were not under arrest, and they never asked to leave; and he would have let them go if they had asked.
When the three plaintiffs arrived at the private room where they were told not to speak among themselves, Wise questioned each one individually outside the room after advising him of his constitutional rights. Because Wise received some inconsistent answers, he went back and forth to the surveillance room to review tapes on several occasions, and he questioned Reeves twice. *467 About one and one-half hours after plaintiffs were taken to the private room, Wise told them they were free to leave, but that their chips would be held as possible evidence pending further investigation. He told them they would be notified if additional investigation warranted further questioning or filing of charges.
Kavanaugh's testimony was relatively consistent with that of Wise on the arrest issue. However, the context of his admissions that he and Wise determined "when these gentlemen were free to leave after questioning" and that "the gentlemen were released" after an hour and one-half of questioning suggested he believed plaintiffs were not free to leave earlier.
The testimony of the three plaintiffs directly contradicted Wise. Romero testified that Wise told him at the table that he was under arrest and "to put his [expletive deleted] hands upon the table." Harrison and Reeves did not hear anyone specifically say they were under arrest, but they believed they were. Plaintiffs testified they yielded involuntarily to the authority of the law enforcement officers who pushed and shoved them to the private room and refused to inform them what they had done or why they were being taken out of the casino.[3] They felt they had no choice but to yield to the authority exerted by the troopers, and they certainly did not feel free to leave. Their request to make a phone call was denied, and they were refused access to a rest room for the first hour, after which a security officer accompanied Romero into the rest room. According to Romero, he was called a liar and cursed again by Wise when he denied knowing Trout. Reeves testified without contradiction he was very nervous and had chest pains in the private room, but his request for a doctor or nurse was met with a suggestion to lie on the floor.
Under the evidence found credible by the trial judge, no reasonable person in the position of the three plaintiffs would have believed he or she was free to leave at any time between the "securing" of Table 115 and the "release" of the three plaintiffs. Moreover, the troopers clearly manifested an intent to impose an extended restraint on plaintiffs' liberty. Although Wise professed that he only wanted to ask plaintiffs two questions, he admitted he could have done this in a brief detention at the table (as was done with Shaw) and that he could have used the names and addresses taken from their driver's licenses and had them questioned extensively under a district attorney's subpoena. Wise's version of the incident insisting that plaintiffs voluntarily accompanied him to the private room, even though he kept telling them they were not under arrest, was rejected by the trial judge, and that decision was supported by credible evidence.
On this record, I cannot say that the lower courts erred in concluding Wise and Kavanaugh placed the three plaintiffs under arrest. Thus, in my view, it is necessary to determine whether the troopers had the reasonable cause or probable cause required by Article 213 to do so.
As stated above, probable cause to arrest exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable and trustworthy information, are sufficient to justify a person of ordinary caution in believing that the person to be arrested has committed a crime. In the present case, the State Police really do not argue that they had probable cause to arrest plaintiffs; rather, they rely on the contention that plaintiffs were not taken to the private room against their will, a contention correctly rejected by the lower courts. Nevertheless, I discuss briefly the absence of the necessary probable cause.
The facts and circumstances relied on by the troopers were the information furnished by Harrah's lead surveillance man and the knowledge obtained personally from their observing live and videotaped conduct by plaintiffs on the monitors.[4] Harrah's lead man, *468 while asserting Trout definitely was cheating, reported as to plaintiffs only "that he [Trout] was having interactions with Mr. Reeves, Romero and Mr. Harrison and that it appeared to me that they knew each other and perhaps maybe were together as a group." This information hardly provided probable cause for the arrest or extended detention of Harrison and Romero.
The troopers themselves watched the conduct of the players on monitors, both live and on videotape, for twenty to thirty minutes. They testified that they observed, and the videotapes reviewed by this court showed, Trout conversed frequently with Reeves; Trout went into Reeves' chips and made change; Trout placed bets in the circle for Reeves and gave him advice on drawing cards; Trout "tunneled" one of Reeves' bets, and Reeves ultimately took back the chip Trout used for "tunneling;" Reeves conversed frequently with Romero and with Harrison; and Romero and Harrison "high-fived" across the table on one occasion. However, the tapes showed no such interaction between Trout and the other two plaintiffs, and there was no audio recording to reveal conversation and comments. True, Reeves and Romero displayed their apparent friendship, but this conduct clearly was not unusual in the highly emotional gambling atmosphere with free-flowing complimentary alcoholic beverages.
The facts and circumstances available to the arresting officers fell far short of constituting probable cause to arrest Harrison and Romero or to detain them for a lengthy period. Although there arguably was sufficient probable cause to hold Reeves for extended questioning, Harrison and Romero did little more than act friendly with Reeves in an atmosphere of celebration and enjoyment. The "capping" by Trout was open and obvious on the tapes, and was immediately detected and halted when the experienced dealer took over the table. There was no evidence of any diversionary conduct by Harrison or Romero simultaneous with the numerous videotaped incidents of "capping" by Trout, except for Trooper Wise's testimony that Harrison was talking to the dealer on one occasion that Trout "capped" a bet. Moreover, as Trooper Wise pointed out, casino cheaters frequently take advantage of innocent conduct by other players or persons in the casino that distracts the dealer momentarily.[5] Finally, even if Reeves provided some inconsistent answers during the individual questioning, this would not constitute probable cause to arrest plaintiffs in the first place, and at most merely constituted a basis for additional questioning of Reeves during the already extensive detention.
Thus, I conclude that the record supports the judgments of the lower courts holding the State Police liable for the damages sustained by Harrison and Romero and would affirm this aspect of the lower courts' judgment.
NOTES
[*] Knoll, J., not on panel. Rule IV, Part 2, § 3.
[1] After the players in a blackjack game have placed their chips in the betting circle, the dealer announces "no more bets" and deals the cards. The rules prohibit the players thereafter from touching the chips in the betting circle. "Capping" occurs when a player adds a chip to the top of his stack of chips in the betting circle after the cards have been dealt and the player appears likely to have a winning bet. "Tunneling" occurs when a cheating player places a chip under the stack of chips after the cards have been dealt. Trout was actually tunneling.
[2] The tapes actually show only one "high-five" between Romero and Harrison.
[3] Cheaters in casinos frequently use "boomers" to accomplish cheating while the dealer and the pit boss are distracted. The "boomer" may be a person who unwittingly causes a distraction or may be a person who acts deliberately in collaboration with the cheater.
[4] Harrah's videotaped the activity at Table 115 from 4:10 p.m. until 4:41 p.m., the time that the officers escorted the plaintiffs from the table, and thereafter until 4:48, when the officers finished collecting the chips from the table. However, this activity was videotaped by several cameras from various angles, and the total viewing time for all of the tapes is several hours.
[5] None of the plaintiffs ever asked to leave. The police officers testified that if they had asked to leave, their request would have been honored.
[6] "Reasonable cause" under Article 213 is the equivalent of "probable cause." State v. Weinberg, 364 So.2d 964, 969 (La.1978).
[7] Louisiana has set time limits for certain kinds of detentions upon less than probable cause. Under La.C.Cr.P. Art. 215, a merchant may detain a suspected shoplifter for up to 60 minutes, unless it is reasonable under the circumstances that the person be detained longer, where the merchant has reasonable cause to believe the person has committed a theft of goods. Under La.C.Cr.P. Art. 215.2, a specifically authorized employee of a correctional institution may detain a person for up to 60 minutes where he has reasonable cause to believe that the person is carrying certain contraband.
[8] Under U.S. v. Mendenhall, it is arguable that plaintiffs were not even "seized" under the Fourth Amendment because they voluntarily went to the dispatch office and answered the officer's questions and never asked to leave.
[9] We note that liability for false arrest has been extended to one who instigates, assists in or encourages a false arrest. Stuart M. Speiser et al., The American Law of Torts § 27:3 (1990). However, a person who provides the police with accurate information upon which the police exercise judgment is not liable for false arrest. Restatement (Second) of Torts § 45A cmt. c (1965); David W. Robertson et al., Cases and Materials on Torts 25, n. 5 (1989).
[1] La.Code Crim. Proc. art. 215.1 A provides:

A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
[2] La.Code Crim. Proc. Art. 213(3) provides:

A peace officer may, without a warrant, arrest a person when:
...
(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer.
[3] The videotapes showed that Trooper Wise grabbed Harrison's shirt in removing him from the chair.
[4] Trooper Wise added that he was additionally suspicious because cheaters frequently search out "weak dealers."
[5] Wise maintained that Trout used plaintiffs as "boomers," even if they were unknowing facilitators.