STATE OF LOUISIANA

COURT OF APPEAL

*WIL III ~~ JEW*
*PMc ~~ JEW*
*JEW*

FIRST CIRCUIT

2020 KA 0585

STATE OF LOUISIANA

VERSUS

MICHAEL HALFORD

Judgment Rendered: **JUN 0 4 2021**

\*\*\*\*\*\*\*\*

Appealed from the 21st Judicial District Court
In and for the Parish of St. Helena
State of Louisiana
Case No. 20028

The Honorable Jeffrey Johnson, Judge Presiding

\*\*\*\*\*\*\*\*

Cynthia K. Meyer
Louisiana Appellate Project
New Orleans, LA

Counsel for Plaintiff/Appellant
Michael Halford

Michael Halford
Angola, LA

In proper person

Scott M. Perrilloux
District Attorney
Richard McShan
Brett Sommer
Assistant District Attorneys
Greensburg, LA

Counsel for Defendant/Appellee
State of Louisiana

BEFORE: McCLENDON, WELCH, AND LANIER, JJ.

**LANIER, J.**

The defendant, Michael Lynn Halford, was charged by grand jury indictment with first degree murder, a violation of La. R.S. 14:30. He pled not guilty. The defendant filed a motion in limine to prohibit the use of a statement and/or testimony of Jessica Raymond based on spousal privilege. After a pretrial hearing, the trial court found that no spousal privilege existed. The defendant did not testify at trial. After a trial by jury, the defendant was found guilty as charged. The trial court sentenced the defendant to life imprisonment at hard labor, to be served without the benefit of probation, parole, or suspension of sentence.[1]

The defendant now appeals, assigning as error in a counseled brief the trial court's denial of challenges for cause of several prospective jurors and the trial court's ruling on the motion in limine. The defendant filed a pro se brief raising sufficiency of the evidence and supplementing the arguments raised in the counseled brief. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On August 7, 2012, Rhonda Morris, a postal worker in Greensburg, Louisiana, approached the driveway of John Nelson Hornsby (the victim) while on her mail route, and observed that his house had completely burned down. She further noticed that the driver's door of the victim's truck was ajar. She walked around to the front of the truck and saw the victim's body lying in the grass. Ms. Morris called the St. Helena Parish Sheriff's Office (SHPSO) and waited for an ambulance and the police to arrive.

Officers responded to the scene, and when they arrived, Deputy Micah Woodard spoke to Ms. Morris as the other officers began to check and secure the

---

[1] The State did not seek the death penalty in this case.

2

scene. Patrick Lane of the Louisiana State Police Crime Lab (crime lab) also arrived at the scene, took video footage, and collected evidentiary items and samples. SHPSO detectives Laurie Sibley and Gary Cannon arrived at the scene at approximately 10:00 a.m. Detective Cannon photographed the scene, including the victim, a maul or sledgehammer located near the victim's body, and the left front tire of the victim's truck, which had blood and gray hair on it matching the victim's hair color.

Detectives Sibley and Cannon questioned neighbors in the area and learned that noises, including loud popping and dogs, were heard that morning from about 4:00 a.m. to about 6:00 or 6:30 a.m. The detectives further attended the victim's autopsy, collected swabs and fingernail clippings taken from the victim, and sent the items to the crime lab for testing. After the SHPSO received verbal communication of the crime lab results showing the defendant's DNA was located under the victim's fingernails, a warrant for the defendant's arrest was obtained and executed.

Jessica Raymond, the defendant's wife at the time of the offense, visited the defendant in jail after his arrest.[2] Ms. Raymond testified at trial that, prior to the jail visit, she suspected that the defendant had committed the murder. She further testified that she held a conversation with the defendant during the jail visit in an attempt to elicit a confession and that the defendant, in response, confirmed that he killed the victim. The defendant then instructed Ms. Raymond to hide evidence of the crime for him.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number one of his pro se brief, the defendant argues that the State failed to meet its burden of proof beyond a reasonable doubt of every

---

[2] Ms. Raymond testified that she had recently married before the trial and that her last name at the time was Nolley. Herein, we will use Raymond, the last name given during her testimony at the pretrial hearing on the motion in limine.

essential element of the offense. Noting that the defendant had regularly been in and around the victim's residence prior to his death to do various errands for him, the defendant argues that the State failed to prove the significance of DNA and fingerprint evidence obtained. The defendant also contends that there was no evidence to support the State's theory that he was present when the victim was murdered. He contends that the video footage shown at trial only proved that he was at a convenience store at 3:55 a.m., five minutes before the approximate time of the victim's murder. In that regard, he further contends that there was no actual determination of the distance between the store and the victim's residence and/or how long it would have taken him to drive from one location to the other.

The defendant further notes that no one witnessed him commit the murder. He argues that "the mere presence of [his] DNA being under fingernails on the victim's left-hand ... in no way links him to the murder." He further argues that the presence of his fingerprint on a revolver only shows that at some point in time, he had touched the gun, possibly while in the presence of the victim. The defendant contends that the State erroneously placed high reliability on Ms. Raymond's "questionable" allegation that he confessed to the murder. He concludes that the State's evidence at the most shows that he may have been involved in a theft or burglary. Thus, he argues that the conviction should be reversed.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); **State v.**

4

**Ordodi**, 2006–0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 2001–2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. It is the fact finder who weighs the respective credibility of each witness, and this court will generally not second-guess those determinations. **State v. Hughes**, 2005–0992 (La. 11/29/06), 943 So.2d 1047, 1051; **State v. Davis**, 2001–3033 (La. App. 1st Cir. 6/21/02), 822 So.2d 161, 163–64.

Louisiana Revised Statutes 14:30(A)(5), in pertinent part, provides that "[f]irst degree murder is the killing of a human being ... [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is ... sixty-five years of age or older." Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. Specific intent to

5

kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. **State v. Thomas**, 2019-0409 (La. App. 1st Cir. 10/25/19), 289 So.3d 1030, 1038, writ granted in part on other grounds, 2019-01819 (La. 6/22/20), 297 So.3d 727. Conversely, a defendant's confession is direct evidence, for it is an acknowledgment of guilt for which no inference need be drawn. **State v. Landry**, 2019-0486 (La. App. 1st Cir. 2/21/20), 297 So.3d 8, 15. See also La. R.S. 15:449; **State v. Brown**, 2013-0560 (La. App. 1st Cir. 4/30/14), 2014 WL 2711808, at *4, writ denied, 2014-1418 (La. 9/18/15), 177 So.3d 1066.

The autopsy of the victim was performed by Dr. Dana Trosclair, who was accepted as an expert in forensic pathology. Dr. Trosclair testified that the victim suffered multiple blunt force injuries consisting of lacerations, abrasions, and contusions on his face, head, and arms. She further confirmed that some of the lacerations on the victim's head were consistent with the use of a large hammer in inflicting the injuries. She also testified that the victim suffered a contusion to the left side of his face and skull, consistent with being rolled over by the tire of a vehicle. The victim also had defensive wounds on his arms and fractured ribs on his left side. The victim's cause of death was multiple blunt force injuries to the head and chest. Dr. Trosclair further testified that the victim had thermal injuries to the left side of his body, particularly his legs, but those injuries were sustained postmortem (after death), revealing that he was already deceased at the time of the fire.

After his arrest, the defendant was read his rights and did not admit to committing the offense. However, the defendant informed the police that on the day in question, he left home during the early morning hours to buy cigarettes from a convenience store located across the street from the SHPSO and approximately five to six minutes from the victim's residence, the scene of the murder. Based on the defendant's statement, the detectives went to the convenience store and

obtained surveillance footage showing the defendant at the store at 3:55 a.m. Ms. Raymond corroborated the identity of the person in the surveillance video as the defendant.

Ms. Raymond testified that the victim, whom she knew as a neighbor and friend of the defendant's family, lived about a mile and a half away. She confirmed that the victim often came to their residence, and the defendant occasionally went to the victim's residence to do work or odd jobs for him. Ms. Raymond also testified that she confronted the defendant during a jail visit and told him that she knew "what he did." According to Ms. Raymond, the defendant gave her confirmation, telling her that he already knew that she knew what he had done, and it was at this point that Ms. Raymond knew the defendant "had killed [the victim]."

Ms. Raymond further testified that she believed certain items had been stolen from the victim and that the defendant told her that the items were located in his mother's shed and in the woods behind his mother's house. Ms. Raymond subsequently relayed the information to her attorney and the defendant's mother, Natalie Ficklin.

Ms. Ficklin called the SHPSO and gave Detective Sibley consent to search her property. The search of the wooded area behind Ms. Ficklin's home and a search of her shed resulted in the recovery of six long guns and a green duffle bag containing a pill bottle with the victim's name on it, bullets, coins, jewelry, and a revolver. The tag attached to the duffle bag had the victim's name on it. The revolver was sent to the crime lab for testing. The victim's death certificate indicated his date of birth as December 25, 1936. The parties stipulated at trial that if the victim's daughter, Roxanne Hornsby, were called to the stand, she would testify that the victim was seventy-five years old at the time of his death and that the items discovered at Ms. Ficklin's residence were the property of the victim.

7

Paul Berry, a crime lab forensic DNA analyst accepted as an expert in DNA analysis, testified that the swab taken from the left-hand fingernail scrapings of the victim were consistent with a mixture of DNA from two individuals and that the defendant could not be excluded as the minor DNA contributor. A blood sample was taken from the sledgehammer, and the sample tested positive for the victim's DNA. Crime lab latent print comparison analyst Melissa Goudeau, accepted as an expert in latent print comparison and crime scene investigation, testified that a fingerprint taken from the revolver was identified as the left thumb print of the defendant.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. An appellate court will not reweigh evidence to overturn a fact finder's determination of guilt. **State v. Taylor**, 97–2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See **State v. Mitchell**, 99–3342 (La. 10/17/00), 772 So.2d 78, 83.

In this case, the jury heard testimony regarding the defendant's own statements to Ms. Raymond implicating himself in a crime and leading to the recovery of the victim's stolen items. See **State v. Eason**, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 68 and 70-71 (noting the jury must have accepted the testimony of three witnesses who all stated that the defendant had confessed to killing the victim, this court found the evidence sufficient to support the defendant's identity as the perpetrator of the second degree murder of the victim); **State v. Taylor**, 2016-1373 (La. App. 1st Cir. 4/12/17), 2017 WL 1376520, at *4 (holding that it was the province of the jury to accept the testimony of a known drug user, who stated that the defendant confessed to killing the victim); **State v. Chester**, 2019-363 (La. App. 5th Cir. 2/3/21), ___ So.3d ___, ___, 2021 WL 369554, at *15 (wherein the court noted testimony by the defendant's ex-girlfriend

8

that the defendant had confessed to her that he had killed the victim was sufficient to establish the defendant as the victim's killer). The jury also heard testimony regarding the defendant's statements to the police that led them to recovering the surveillance footage. The footage placed him about five minutes away from the scene, just prior to neighbors reportedly hearing noises. Further, the jury heard testimony regarding the victim's multiple injuries, the processing of the crime scene, the evidence showing that the defendant's DNA was located under the victim's fingernails, and the evidence showing that the defendant's fingerprint was found on one of the stolen items.

We find that based on the evidence presented, a trier of fact could have reasonably concluded that the defendant inflicted the victim's lethal blunt force injuries, as the victim attempted to defend himself to no avail. We cannot say that the jury's unanimous determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. Viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of first degree murder and the defendant's identity as the perpetrator. Thus, we find no merit in pro se assignment of error number one.

## DEFENSE CHALLENGES FOR CAUSE DURING VOIR DIRE

In counseled assignment of error number one, the defendant contends that his peremptory challenges were exhausted during voir dire due to the trial court's erroneous denial of challenges for cause regarding seven prospective jurors. He argues that a review of the voir dire conducted in this case indicates that the trial court routinely denied defense challenges for cause without expressing adequate reasons. The defendant further contends that the reason for the trial court's

9

continued erroneous denials of defense counsel's challenges for cause became apparent when alternate jurors were being selected.

The defendant notes that each side was granted one peremptory challenge for selecting alternate jurors and that there were only two prospective jurors remaining. He notes that at that time, the trial court stated, "but we're not pulling another panel. So if you exercise two we're not having any alternates." Including one of the potential alternate jurors, the defendant notes that he used peremptory challenges to remove five of the seven challenged jurors at issue, that the other two served on the jury, and that he exhausted all of his peremptory challenges. The defendant argues that he was deprived of his statutory and constitutional due process rights. In assignment of error number two of his pro se brief, the defendant reiterates the arguments stated above, restates the applicable law, and contends that he was denied his constitutional right to an impartial jury.

Louisiana Code of Criminal Procedure article 797 provides, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his partiality. La. Code Crim. P. art. 797(2). Further, a defendant may challenge a juror for cause on the grounds that the relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict. La. Code Crim. P. art. 797(3). However, the law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the prosecuting witness, the prosecuting attorney, and the witnesses who may testify at trial. Rather, the law requires that jurors be fair and unbiased. **State v. Morgan**, 2017-0932 (La. App. 1st Cir. 2/20/18), 2018 WL 947011, at *7, writ denied, 2018-0465 (La. 1/14/19), 260 So.3d 1215, cert. denied, ___ U.S. ___, 139 S.Ct. 1568, 203 L.Ed.2d 730 (2019); **State v.**

**Stewart**, 2008–1265 (La. App. 5th Cir. 5/26/09), 15 So.3d 276, 288, writ denied, 2009–1407 (La. 3/5/10), 28 So.3d 1003.

A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. However, a trial court's ruling on a motion to strike jurors for cause is afforded broad discretion because of the court's ability to get a first-person impression of prospective jurors during voir dire. **State v. Brown**, 2005–1676 (La. App. 1st Cir. 5/5/06), 935 So.2d 211, 214, writ denied, 2006–1586 (La. 1/8/07), 948 So.2d 121. Moreover, a prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. **State v. Kang**, 2002–2812 (La. 10/21/03), 859 So.2d 649, 653. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges.[3] This is because an erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. **Kang**, 859 So.2d at 651-52.

### Prospective jurors Karl, Armstrong, Ratliff, and Herring

The first prospective juror at issue, Roddy Karl, informed the trial court that, while he did not personally know the assistant district attorney assigned to this case, he previously testified as a witness and victim of stalking in a grand jury proceeding in another case to which the assistant district attorney was assigned. He confirmed that it would not influence him in any way. Mr. Karl denied that his

---

[3] In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges. La. Code Crim. P. art. 799. In this case, the defendant exhausted all twelve peremptory challenges.

previous experience would affect his ability to make decisions based solely from listening to the facts and circumstances of the instant case.

During follow-up questioning by the defense attorney, Mr. Karl stated that the accused in the other case was not convicted, but that he had "no issues" with the district attorney's office. He responded positively when asked if he was happy with the district attorney's office after the case. He agreed that he could be fair if the defendant in this case did not testify, stating, "I think it's his choice," adding, "no person should be compelled to testify against himself." While challenging Mr. Karl, the defense attorney stated, "He knew [the prosecutor] and that he helped [sic] when he was a victim." The prosecutor stated that Mr. Karl twice said he could be fair. The trial court denied the challenge for cause without objection. The defendant exercised a peremptory challenge to excuse Mr. Karl.

Ms. Martha Armstrong stated that she knew the assistant district attorney and his wife, stating, "I've just known him forever." She confirmed that it would not influence her and agreed that she could vote not guilty if the assistant district attorney failed to prove his case beyond a reasonable doubt without any explanation being owed to the assistant district attorney. When the prospective jurors were asked if they had heard about the case, Ms. Armstrong stated, "I'm pretty sure everyone's heard." She stated that she only "knew of" the victim, but actually knew his sister. She admitted she had heard that the victim died and that she knew "basically 90 percent of" the people listed as potential witnesses. She also indicated that a "robbery" occurred at her home in the past but that she was not there when it occurred. She indicated that she would not be affected and that she would be able to listen to the case and form a decision based on what she heard in the courtroom. She further stated that about seven years before the trial, she had a confrontation with a game warden who brought her to jail for DWI, but the

charges were not pursued. She denied ever socializing with the assistant district attorney or receiving any assistance from him regarding her DWI arrest.

However, when subsequently asked if knowing witnesses would affect her ability to be impartial or make her want to believe them, she stated, "I'm thinking." When later asked if she would hold it against the defendant if he did not testify, she stated that she would like to hear him testify, but confirmed that she would not hold it against him if he did not. The defense counsel challenged Ms. Armstrong based on her knowing the assistant district attorney, many potential witnesses, and the victim's sister, her past DWI arrest, and the fact that she was a victim of a crime. In denying the challenge, the trial court noted that as to each issue, Ms. Armstrong indicated that she could be fair. The trial court noted that it would not presume otherwise. The defendant objected to the trial court's ruling and exercised a peremptory challenge to remove Ms. Armstrong.

Prospective jurors Gordon Ratliff and Brenda Herring had histories in law enforcement. Specifically, Mr. Ratliff was a SHPSO reserve deputy "on and off" for the three years before the trial, and Ms. Herring was a civil deputy at the Tangipahoa Parish Sheriff's Office. Mr. Ratliff stated that although he knew everyone at the SHPSO, he could be fair and impartial and would determine the facts based on what he heard in the courtroom. Mr. Ratliff denied having any information regarding or knowledge of the instant case. Ms. Herring similarly indicated that while she knew Deputy Woodard, she could be fair and would not tend to believe the testimony of an officer simply because the witness was an officer.

The defense counsel challenged Mr. Ratliff strictly on his status as a reserve deputy and similarly challenged Ms. Herring based on her affiliation with law enforcement and the fact that she knew Deputy Woodard. The trial court denied the cause challenges as to Mr. Ratliff and Ms. Herring, noting that they made it

13

clear that they would not be influenced and that they could be impartial. The defense attorney objected to each ruling and exercised peremptory challenges to excuse both prospective jurors.

A juror's association with law enforcement agencies or personnel will not alone disqualify him from service. The fact that a prospective juror is "friends" with, or related to, law enforcement officials or the district attorney is not grounds for automatic exclusion for cause. **State v. Manning**, 2003–1982 (La. 10/19/04), 885 So.2d 1044, 1078, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); **State v. Hudson**, 2015–0158 (La. App. 1st Cir. 9/18/15), 2015 WL 5516100, at *11. Even where a prospective juror's affiliations raise an issue regarding his ability to be impartial, if, after voir dire examination, the trial court is satisfied the prospective juror can render an impartial verdict according to the law and evidence, it is the trial court's duty to deny the challenge for cause. **Manning**, 885 So.2d at 1078.

In the instant case, each of the foregoing prospective jurors were all challenged based on affiliations with law enforcement or the assistant district attorney, and each affirmatively asserted that they could be fair and impartial upon voir dire examination. As such, the trial court indicated that it was satisfied that each of the jurors could render an impartial verdict in accordance with the law and evidence. Accordingly, we cannot say that the trial court abused its discretion in denying the cause challenges as to Mr. Karl, Ms. Armstrong, Mr. Ratliff, and Ms. Herring.

*Prospective juror D'Quence Self*

The defendant further challenges the trial court's denial of his challenge for cause of prospective juror D'Quence Self, whose father and grandfather had a friendship with the victim. Ms. Self's father, Mr. James Self, was also a

prospective juror. Ms. Self said the victim would call her grandfather every day.[4] Ms. Self stated that she would occasionally speak to the victim on the phone, give him the weather forecast, and occasionally bring him food. She stated that she did not think knowing the victim would pose a problem and denied that she was there to seek vengeance. She confirmed that she could listen to the facts and circumstances of the case to make a decision as to whether she thought the defendant was guilty beyond a reasonable doubt.

Mr. Self stated that he had known the victim for a long time, described him as a good friend, and stated that he used to do work around the house for him. Mr. Self confirmed that it would be "kind of hard" for him to give the defendant a fair trial and confirmed that he did not think that he would want someone like himself on the jury if it were him standing trial.

Ms. Self confirmed that she did not know the victim as well as her father did and further stated that she only spoke to him on the phone, not in person, whenever he would call her grandfather's house. She initially acknowledged that her association with the victim would cause her some concern like her father, but then stated, "I'm not sure if [sic] would affect my fairness. Because, I mean, if there's evidence to prove that he did it, then I would go with the evidence." As she stated, "Well, if the evidence don't prove that he didn't do it, then—" the defense counsel interjected and asked if she would have some concern about being selected and would rather not be selected, to which she conceded.

In challenging Ms. Self, defense counsel argued, "She indicated that she could not be fair based on the relationship with [the victim]." In response, the trial court stated, "I don't think that's what she indicated. … I think that's what her dad indicated, but I don't think that's what she indicated." In so finding, the trial court

---

[4] Ms. Self confirmed that her grandfather, Leon Self, was present in the courtroom that day and that she believed he was there as a spectator.

denied the defendant's challenge of Ms. Self, but granted the challenge as to Mr. Self. The defense counsel objected, and Ms. Self was accepted as a juror, as the defense had already exhausted its peremptory challenges.

As noted herein, a trial court's ruling on whether to seat or reject a juror for cause will not be disturbed unless a review of the voir dire as a whole indicates an abuse of the great discretion accorded to the trial court. **State v. Martin**, 558 So.2d 654, 658 (La. App. 1st Cir.), writ denied, 564 So.2d 318 (La. 1990). Thus, only where it appears upon review of the voir dire examination as a whole that the trial court's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will the ruling of the trial court be reversed. See **State v. Lee**, 93-2810 (La. 5/23/94), 637 So.2d 102, 108. Having reviewed the voir dire of Ms. Self, we cannot say the trial court abused its discretion in denying the cause challenge. See **State v. Allen**, 95-1754 (La. 9/5/96), 682 So.2d 713, 724 (although the juror admitted having known the victim for two years and drinking beer with the victim at the club where the victim was murdered, the court held the juror did not have an extensive personal relationship with the victim and the record failed to show the juror's relationship with the victim would influence his verdict); **State v. Hallal**, 544 So.2d 1222, 1230, (La. App. 1st Cir. 1989), vacated on other grounds, 557 So.2d 1388 (La. 1990) (finding the trial court did not abuse its discretion in denying a cause challenge for a juror who admitted she knew the victim as well as his family and that the relationship would make it difficult to serve on the jury).

*Prospective juror McGee*

Prospective juror Janice McGee informed the defense counsel that she was not doing well the day of the trial, stating that she had back surgery, that she still had problems with her neck and back, and that her right leg was weak, such that she needed a walker, cane, or crutch. She noted that while she had a cane, she was uncomfortable sitting. The defense counsel's subsequent challenge of Ms. McGee

based on her back surgery was denied by the trial court. The defense counsel initially objected, but then declined to excuse Ms. McGee peremptorily, stating, "Hold on a minute. I think I [sic] fine with her." Ms. McGee served on the jury.

In **State v. Magee**, 2011-0574 (La. 9/28/12), 103 So.3d 285, 307, cert. denied, 571 U.S. 830, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013), the Louisiana Supreme Court recognized that even where a defendant ultimately exhausts his peremptory challenges, he must use one of his remaining peremptory challenges curatively to remove the objectionable juror or waive the complaint on appeal. This requirement, through which the defendant is forced to use a remaining peremptory challenge in order to preserve error in the denial of a challenge for cause, is sometimes referred to as the "strike or waive" rule.[5]

In the instant case, while the defendant ultimately exhausted his peremptory challenges, he declined to curatively use an available peremptory challenge against Ms. McGee. Thus, applying the "strike or waive" rule, the defendant waived his complaint with regard to the trial court's ruling denying his cause challenge with respect to Ms. McGee.

*Prospective juror Wallace*

The final challenge for cause ruling at issue on appeal came during the selection of an alternate juror, at which point the State and the defendant were each given an additional peremptory challenge to exercise. The defense counsel challenged prospective alternate juror Chester Wallace for cause without providing a basis for the challenge. During voir dire, Mr. Wallace stated that he knew a physician who was one of the potential witnesses, that his uncle was a retired police officer from New Orleans, and that his uncle's son worked for the FBI.

_____

[5] In **Magee**, the court found no constitutional or statutory infirmity in the "strike or waive" rule and thus applied the rule to hold that the defendant had waived his complaints regarding the district court's denial of his cause challenges for four of the five jurors so challenged. **Magee**, 103 So.3d at 310.

17

When asked if these relationships would affect him, he stated, "Not at all." When asked what he thought about the defendant possibly not testifying, he noted that he would prefer to hear both sides of the story. However, he repeatedly confirmed that he could be fair and that he would not hold it against the defendant if he exercised his right to remain silent. The trial court denied the general challenge for cause, noting "at the end of the day ... he said he could do it." Without objecting to the trial court's ruling, the defense counsel exercised a peremptory challenge to excuse Mr. Wallace.

At the outset, we note that the defendant failed to lodge a contemporaneous objection to the trial court's ruling on his challenge for cause as to prospective juror Mr. Wallace. See La. Code Crim. P. art. 800(A). The defendant, further, did not articulate a basis for the challenge of Mr. Wallace.[6] Thus, the defendant is precluded on appeal from urging error as to the trial court's denial of his challenge for cause as to prospective juror Mr. Wallace.

Furthermore, as detailed above, we have thoroughly reviewed the examination of each of the prospective jurors at issue. We find that as to each potential juror, their responses as a whole indicated their willingness and ability to be fair and unbiased and render an impartial verdict according to the law and evidence. We find no abuse of discretion by the trial court in denying the defendant's challenges for cause at issue. Counseled assignment of error number one and pro se assignment of error number two are without merit.

---

[6] In **State v. Pinion**, 2006-2346 (La. 10/26/07), 968 So.2d 131, 136, the Louisiana Supreme court stated: "In jury selection, counsel satisfies the requirements of Louisiana's contemporaneous objection rule *by stating his grounds for a cause challenge* and then by removing the juror with one of his remaining peremptory challenges when the court declines to excuse the juror for cause. (Emphasis added.)

## SPOUSAL PRIVILEGE

In counseled assignment of error number two, the defendant contends that the trial court erred in denying his motion in limine to prohibit the testimony of Ms. Raymond on the basis of spousal privilege, regarding the conversation with the defendant in which he purportedly confirmed that he committed the offense. The defendant notes that in denying the motion, the trial court stated that the communication at issue was not intended to be confidential and commented that children and other people were present at the time. The defendant claims that the trial court ignored testimony indicating that the children had "ran off" before the conversation took place and that others were not privy or within range of hearing the conversation. The defendant notes that he did not waive his spousal privilege. He contends that the trial court's ruling allowing his former spouse to testify as to the "alleged private conversation" between her and her then husband, the defendant, violated his right to spousal privilege. He concludes that the unanimous verdict in this case was attributed to the wrongful admission of this evidence and that his conviction must be vacated. In assignment of error number three of his pro se brief, the defendant reiterates the above, specifically contending that any information he allegedly shared with Ms. Raymond in confidence is protected by the spousal privilege.

Louisiana allows for two distinct spousal privileges—the spousal confidential communications privilege and the spousal witness privilege. These spousal privileges are created by statute and are not constitutional rights. **In re Subpoena,** 2019-00962 (La. 5/28/20), ___ So.3d ___, ___, 2020 WL 3424310, at *3. Louisiana Code of Evidence article 504(B), establishing the spousal privilege to confidential communications, provides as follows:

> Each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential

communications with the other spouse while they were husband and wife.

Under La. Code Evid. art. 504(A), a communication is defined as "confidential" if "it is made privately and is not intended for further disclosure unless such disclosure is itself privileged." "Where there is a lack of evidence to the contrary, communications between spouses are presumed to be confidential." **State v. Dupuy**, 319 So.2d 294, 298 (La. 1975) (citing **State v. Pizzolotto**, 209 La. 644, 651-52, 25 So.2d 292, 295 (1946)). Whether a particular communication is protected as confidential is a question of fact to be determined by the trial court. Accordingly, the trial court must assess the circumstances surrounding the alleged confidential communication and the probable intent of the divulging spouse at the time it was made. **State v. Lilly**, 2012-0008 (La. App. 1st Cir. 9/21/12), 111 So.3d 45, 57, writ denied, 2012-2277 (La. 5/31/13), 118 So.3d 386.

Louisiana Code of Evidence article 505, establishing the spousal witness privilege, states:

> In a criminal case or in commitment or interdiction proceedings, a witness spouse has a privilege not to testify against the other spouse. This privilege terminates upon the annulment of the marriage, legal separation, or divorce of the spouses.

The spousal witness privilege set forth in La. Code Evid. art. 505 is held by the witness spouse and can be waived. The statute provides that neither spouse may be compelled to be a witness against the other in a criminal trial. However, the statute does not prohibit a spouse from voluntarily taking the stand against the defendant spouse. **State v. Taylor**, 94–0696 (La. 9/6/94), 642 So.2d 160, 164; **State v. Nash**, 36,038 (La. App. 2d Cir. 6/14/02), 821 So.2d 678, 683-84, writ denied, 2002–2527 (La. 6/27/03), 847 So.2d 1254. If a spouse waives the right to testimonial privilege, the waiver gives the spouse the right to testify against the other spouse as to non-privileged evidence. See **State v. Bennett**, 357 So.2d 1136,

20

1139-40 (La. 1978); **State v. Sarrio**, 2001–543 (La. App. 5th Cir. 11/27/01), 803 So.2d 212, 222, writ denied, 2002-0358 (La. 2/7/03), 836 So.2d 86.

In discussing the source article for La. Code Evid. arts. 504-505, La. R.S. 15:461 (repealed by 1992 La. Acts, No. 376, § 6), the Louisiana Supreme Court noted the distinction to be drawn between the evidentiary and testimonial privilege. In **Bennett**, 357 So.2d at 1139-40, the court stated the following:

> This statute creates two distinct privileges. The first of these is the privilege which attaches to private conversations between husband and wife and which may be asserted by the defendant-spouse. Secondly, the statute establishes a privilege in favor of a spouse called to testify against the other spouse by providing that neither spouse shall be compelled to be a witness against the other in a criminal proceeding. The exercise of this privilege rests with the testifying spouse alone and may not be invoked by the defendant-spouse.

A privilege may be waived if the person upon whom the privilege has been conferred voluntarily discloses any significant part of the privileged matter. La. Code Evid. art. 502(A).

At the hearing on the motion in limine, which took place two years before the trial, Ms. Raymond testified that she was still married to the defendant but had filed for divorce. She further stated that the defendant was currently incarcerated, and that she had visited with him since his arrest. The trial court informed Ms. Raymond of her right of spousal privilege, indicating that she was not required to testify against the defendant and that statements made during the marriage were privileged. She was told that she could choose to exercise it or not and was asked if it was her desire to move forward with questioning or if she would rather take advantage of the spousal privilege. Ms. Raymond stated that she wanted to move forward. As Ms. Raymond was charged as an accessory after-the-fact to burglary and principal to theft, she was also informed of her constitutional right against self-incrimination and asked if she had an opportunity to discuss her rights with her attorney, who was present and confirmed that he discussed the matter and her

21

rights with her. Ms. Raymond confirmed that she wanted to speak. Ms. Raymond testified that the jail visit at issue took place on May 8, 2013, and that her two children and mother-in-law's husband, Michael Ficklin, were with her for the jail visit. She stated that the defendant was brought out for the visit, and they sat at a table in a room that she described as half the size of the courtroom. She stated that the room may have had two tables, that the defendant was sitting right next to her, and that the children were also in the room. Mr. Ficklin was about five to eight feet away from her at the corner of the table, facing the defendant.

She stated the kids "ran off eventually," and, at that point, she confronted the defendant about his involvement in the offense. She stated that the guard and another family were in the room across the table by a wall at the time, about ten feet away, and that she and the defendant spoke in a normal voice. She specifically denied that they were whispering during the conversation. She also stated that other guards were walking in and out of the room. The trial court ruled that the communication was not intended to be private, noting that it was a public visitation, that children were present, and that there was minimal to no expectation of privacy at all.

In **Dupuy**, the supreme court found no error occurred where the trial court allowed the defendant's wife to testify about statements the defendant made to her. The wife first testified, out of the jury's presence, that there were third parties present during the communications at issue. The defendant did not call the third parties to the stand to refute these claims, despite the third parties being listed as defense witnesses. **Dupuy**, 319 So.2d at 298.

In **Lilly**, this court found spousal privilege did not apply to spousal communications made during jailhouse calls because the couple was put on notice that the phone calls were monitored and possibly recorded. The court stated, "Even if the defendant and his wife never intended for the conversations to be disclosed,

22

the fact that they were aware that a third party could monitor or record their conversation destroyed the confidential nature of the communication." **Lilly**, 111 So.3d at 57.

Herein, we agree with the trial court's assessment that the communication at issue was not a "confidential communication" subject to the spousal evidentiary privilege provided for in La. Code Evid. art. 504. The conversation took place in a public area, the defendant and Ms. Raymond were not whispering, and Ms. Raymond confirmed that other people were present in the room the entire time, though some periodically walked in and out of the room. Although not actively taking part in the conversation, Mr. Ficklin was just a few feet away at the same table, facing the defendant and Ms. Raymond as they spoke. Even if the defendant never intended for the conversation to be disclosed, the fact that both he and Ms. Raymond were aware that other people could monitor or hear their conversation destroyed the confidential nature of the communication.

Under the circumstances, the communication could not be excluded on the basis that it was privileged. Thus, the trial court did not err in allowing Ms. Raymond to testify about the conversation with the defendant during the jail visit over the defendant's objection based on privilege. Further, Ms. Raymond unequivocally waived the right to testimonial privilege, which gave her the right to testify against the defendant regarding the non-privileged communication at issue. Hence, we find no error in the trial court's denial of the motion in limine and therefore no merit in counseled assignment of error number two and pro se assignment of error number three.

**CONVICTION AND SENTENCE AFFIRMED.**

23